1  **GUTRIDE SAFIER LLP**
   MARIE A. MCCRARY (Bar No. 262670)
2  marie@gutridesafier.com
   SETH A. SAFIER (Bar No. 197427)
3  seth@gutridesafier.com
   100 Pine Street, Suite 1250
4  San Francisco, CA 94111
   Telephone: (415) 639-9090
5  Facsimile: (415) 449-6469

6  Attorneys for Plaintiffs

7
                    UNITED STATES DISTRICT COURT
8
                    NORTHERN DISTRICT OF CALIFORNIA
9

10

11 MARCELO MUTO, CRISTINA SALGADO, and        Lead Case No.: 3:21-cv-04643-JD
   DAVID SWARTZ, on behalf of themselves and
12 those similarly situated,                    **CONSOLIDATED COMPLAINT FOR
                                                VIOLATION OF THE CALIFORNIA
13           Plaintiffs,                        CONSUMERS LEGAL REMEDIES ACT;
                                                FALSE ADVERTISING; FRAUD, DECEIT,
14      v.                                      AND/OR MISREPRESENTATION;
                                                NEGLIGENT MISREPRESENTATION;
15 THE COCA-COLA COMPANY, BLUETRITON           AND UNFAIR, UNLAWFUL, AND
   BRANDS, INC., and NIAGARA BOTTLING,          DECEPTIVE BUSINESS PRACTICES**
16 LLC,
                                                JURY TRIAL DEMANDED
17           Defendants.
                                                HON. JAMES DONATO
18

19
   SIERRA CLUB,                                 Case No.: 3:21-cv-04644-JD
20
             Plaintiff,
21
        v.
22
   THE COCA-COLA COMPANY and
23 BLUETRITON BRANDS, INC.,

24           Defendants.

25

26

27

28

                                    -1-

Plaintiffs Marcelo Muto, Cristina Salgado, and David Swartz (collectively, the "Consumer Plaintiffs"), by and through their counsel, bring this Class Action Complaint ("Complaint") against Defendants The Coca-Cola Company ("Coca-Cola"), BlueTriton Brands, Inc. (formerly known as Nestle Waters North America, Inc.) ("BTB") and Niagara Bottling LLC ("Niagara") on behalf of themselves and similarly situated persons.[1]

Plaintiff Sierra Club (the "Sierra Club"), on behalf of itself, brings this Complaint against Coca-Cola and BTB.[2] The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

## INTRODUCTION

1.      This Complaint seeks to remedy Defendants' unlawful, unfair, and deceptive business practices with respect to the advertising, marketing, and sale of water bottled in single-use plastic bottles labeled as "100% Recyclable."

2.      Americans consume water from disposable plastic bottles at a rate of more than 70 million bottles each day.[3] Defendants produce more than 100 billion single-use plastic bottles every year – or 3,400 per second.[4] Over 60 million plastic bottles end up in landfills or incinerators each day.[5] Incineration of plastic releases large quantities of greenhouse gases and toxic air emissions. Over 12 million tons of plastic enters the ocean each year.[6] As consumers have become increasingly aware of

---

[1] The Consumer Plaintiffs and the Sierra Club are collectively referred to herein as "Plaintiffs." Coca-Cola, BTB, and Niagara are collectively referred to herein as "Defendants."

[2] Notwithstanding any allegation or statement in the Complaint, Sierra Club does not assert any claims against, and seeks no relief from, Defendant Niagara Bottling LLC.

[3] Pat Franklin, *Down the Drain*, https://www.container-recycling.org/assets/pdfs/media/2006-5-WMW-DownDrain.pdf (last accessed January 20, 2021).

[4] Sandra Laville and Matthew Taylor, *A million bottles a minute: world's plastic binge 'as dangerous as climate change'* (June 28, 2017), https://www.theguardian.com/environment/2017/jun/28/a-million-a-minute-worlds-plastic-bottle-binge-as-dangerous-as-climate-change (last accessed January 20, 2021).

[5] *Id.*

[6] Nick Young, *How does plastic end up the ocean?*, https://www.greenpeace.org/new-zealand/story/how-does-plastic-end-up-in-the-ocean/ (last accessed January 20, 2021).

the problems associated with plastic pollution, many actively seek to purchase products that are either compostable or recyclable to divert plastic waste from waterways, oceans, their communities, landfills, and incinerators.

3. The plastic waste problem was exacerbated in 2018 when China implemented a plastic recycling import ban on most plastic waste exported from the United States—China's "National Sword" policy. The National Sword policy has permanently changed how the United States processes recycling. Up until 2018, China was the primary export market for plastic waste. However, due to the implementation of National Sword, municipalities have been forced to find new ways to manage plastic recycling. In most cases, they have been forced to burn or incinerate plastics because there is no longer a foreign market for the overwhelming majority of plastic sent for recycling.

4. In the wake of National Sword, environmental organizations such as the Sierra Club and Greenpeace sought to inform the public that reusable bottles are the only truly sustainable choice. Concerned about the growing salience of this message, and seeking to falsely reassure the public about the sustainability of single-use plastics—Defendants and other plastic bottlers countered with the "Every Bottle Back" initiative. Central to this coordinated marketing campaign is the claim "100% Recyclable," which Defendants affix to their single-use plastic water bottles. However, Defendants' plastic bottles are not "100% Recyclable" because: (i) the polypropylene ("PP") bottle caps and the biaxially oriented polypropylene ("BOPP") plastic labels on the bottles are not recyclable and cannot be processed into usable material; (ii) at least 28% of the polyethylene terephthalate ("PET") bottles and high-density polyethylene ("HDPE") bottle caps sent to recycling centers are lost in processing or are contaminated and thus end up in landfills or are burned; and (iii) domestic recycling facilities only have the capacity to process approximately 22.5% of the PET and HDPE consumed in the United States.

5. Defendants' continued use of misleading and deceptive recyclability claims on their Products serves to defraud the public about plastic water bottles. It falsely informs consumers that they are making an environmentally responsible choice when they purchase and dispose of Defendants' plastic water bottles in a municipal recycling bin. In truth, Defendants' single-use plastics are damaging the environment even when consumers properly dispose of the bottles in a recycling bin. If consumers

knew the truth of the matter, they could make more informed decisions about consuming products that are truly sustainable. Defendants' representations that the Products are "100% Recyclable" are material, false, misleading, and likely to deceive members of the public. These representations also violate California's legislatively declared policy against misrepresenting the environmental attributes of products.

6.     The Consumer Plaintiffs seek an injunction, against all Defendants, precluding the sale of the plastic bottled water within a reasonable time after entry of judgment, unless the Products' packaging and marketing are modified to remove the "100% Recyclable" misrepresentation and to disclose the omitted facts about their true recyclability. Plaintiff Sierra Club seeks an identical injunction with respect to BTB and Coca-Cola. The Consumer Plaintiffs additionally seek restitution and/or damages from all Defendants on behalf of themselves and those similarly situated, namely the price premium they paid for the Products—i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentations—in an amount to be proven at trial using econometric or statistical techniques, such as hedonic regression or conjoint analysis.

## **PARTIES**

7.     Plaintiff Marcelo Muto is, and at all times alleged in this Complaint was, an individual and a resident of Indio, California.

8.     Plaintiff Cristina Salgado is, and at all times alleged in this Complaint was, an individual and a resident of Los Angeles, California.

9.     Plaintiff David Swartz is, and at all times alleged in this Complaint was, an individual and a resident of Oakland, California.

10.     Plaintiff Sierra Club was founded in 1892 and is the nation's oldest grassroots environmental organization. The Sierra Club is incorporated in California, and has its headquarters in Oakland, California. It has more than 784,000 members nationwide. The Sierra Club's mission is "[t]o explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality

of the natural and human environment; and to use all lawful means to carry out those objectives." Consistent with its mission, the Sierra Club is dedicated to the protection and preservation of the environment, including but not limited to, ending the use of single-use plastics and combatting false and misleading environmental claims on consumer goods (i.e., "greenwashing").

11.     Defendant The Coca-Cola Company is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Atlanta, Georgia.

12.     Defendant BlueTriton Brands, Inc. is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Stamford, Connecticut. BlueTriton Brands, Inc. is the successor entity to Nestle Waters North America, Inc.

13.     Defendant Niagara Bottling, LLC is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Ontario, California.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over the Consumer Plaintiffs and the putative Classes' claims against Defendants pursuant to 28 U.S.C. § 1332(d)(2) because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one Consumer Plaintiff is a citizen of a different state than at least one Defendant.

15.     This Court has subject matter jurisdiction over the Sierra Club's claims against BTB and Coca-Cola pursuant to 28 U.S.C. § 1332(a) because the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs; and there is complete diversity of citizenship between the Sierra Club and Coca-Cola and BTB

16.     This action was originally filed as two separate actions, *Swartz v. The Coca-Cola Co.*, No. 21-4643 (N.D. Cal) and *Sierra Club v. The Coca-Cola Company*, No. 21-4644 (N.D. Cal.). The former action was initiated by the Consumer Plaintiffs against Defendants alleging federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The latter action was initiated by the Sierra Club against BTB and Coca-Cola alleging federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). On March 3, 2022, this Court ordered consolidation of the two actions. Sierra Club makes no claims against and seeks no relief from Niagara. Consolidation does not defeat diversity jurisdiction when

each constituent case in a consolidated action separately meets jurisdictional requirements. *See Continental Airlines v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 n.1 (9th Cir. 1987) ("[T]he consolidation of the cases below did not 'make those who are parties in one suit parties in another.'") (quoting *Johnson v. Manhattan Ry.*, 289 U.S. 479, 497 (1933)); *United States v. Cole*, 563 F.2d 35, 38 (2d Cir. 1977) ("[C]onsolidation does not change the rights of the parties in the separate suits . . . [w]e must therefore consider the jurisdictional basis of each complaint separately.").

17. This action is brought by Plaintiffs pursuant, *inter alia*, to the California Business and Professions Code, section 17200, *et seq.* Plaintiffs and Defendants are "persons" within the meaning of the California Business and Professions Code, section 17201.

18. The injuries, damages and/or harm upon which this action is based occurred in or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California, including within this District.

19. The claims in this case arise out of Defendants' California-related activities. Defendants market and sell the Products in California to California consumers. While the Products are marketed and sold in California by Defendants, the Products are not 100% recyclable in California. The Sierra Club has spent significant money, staff time, and other organizational resources in California to counter Defendants' false and misleading recyclability representations. Thus, the conduct alleged herein arises out of Defendants' activities in California.

20. As a direct and proximate result of Defendants' actions in the state of California, the Consumer Plaintiffs and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property. The Consumer Plaintiffs have suffered injury in fact in the price premium they paid for Products—the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentations.

21.     As a direct and proximate result of BTB and Coca-Cola's actions in the state of California, Plaintiff Sierra Club has suffered and continues to suffer, injury in fact and has lost money and/or property. Specifically, Plaintiff Sierra Club suffered an injury in fact and has standing to bring this action because Defendants' misrepresentations regarding the environmental benefits of their Products by marketing and selling the Products as recyclable in California have frustrated the Sierra Club's organizational mission to "protect the wild places of the earth" and to "educate and enlist humanity to protect . . . the natural and human environment." Before this litigation was initiated, the Sierra Club expended money, staff time, and diverted organizational resources in California in response to that frustration of purpose (described in greater detail *infra*). The Sierra Club's diversion of resources to respond to Defendants' misrepresentations regarding the recyclability of the Products has caused the Sierra Club to postpone other projects that could advance the Sierra Club's mission. Thus, the Sierra Club has lost money or property and has suffered an injury in fact due to Defendants' actions of using false, misleading and deceptive labels regarding the recyclability of the Products in California.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

23.     In accordance with California Civil Code Section 1780(c), the Consumer Plaintiffs filed declarations establishing that, on multiple occasions since November 2020, they purchased the Products in Merced County, Riverside County, and Los Angeles County, respectively. (The Consumer Plaintiffs' declarations are attached hereto as Exhibit A.)

24.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## **SUBSTANTIVE ALLEGATIONS**

### **(1) Defendants and the Products at Issue.**

25.     Coca-Cola manufactures, markets, and sells beverages, including bottled water, in the United States under several brand names, including Dasani.

26.     BTB manufactures, markets, and sells beverages, including bottled water, in the United States under several brand names, including Arrowhead, Poland Springs, Ozarka, and Deer Park.

27.     Niagara manufactures, markets, and sells beverages, including bottled water, in the United States under several brand names, including Niagara, Costco Kirkland, Save Mart Sunny Select, and Save Mart Market Essentials.

28.     The following brands of bottled water are referred to herein as the "Products": Dasani, Arrowhead, Poland Springs, Ozarka, Deer Park, Niagara, Costco Kirkland, Save Mart Sunny Select, and Save Mart Market Essentials.

29.     Each of the Products has three basic plastic components: the bottle, the bottle cap, and the label that is wrapped around the bottle. The bottles are made of polyethylene terephthalate (PET, #1 plastic). The Products' bottle caps are made of polypropylene (PP, # 5 plastic) or high-density polyethylene (HDPE, #2 plastic). The Products' labels are made from biaxially oriented polypropylene (BOPP), a form of PP.

30.     Throughout the class period, Defendants have consistently marketed on the Products' packages that they are "100% RECYCLABLE" as shown in the following images.

31.     Dasani:



1

32.    Arrowhead:

2

3

4



5

6

7

8

9

10

11

12

13

14

15    33.    Poland Springs:

16

17

18



19

20

21

22

23

24

25

26

27

28

34.     Ozarka:



35.     Deer Park:




CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

36.    Niagara:



37.    Costco Kirkland:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

38.    Save Mart Sunny Select:



39.    Save Mart Market Essentials:



**(2) Defendants' Representations that the Products Are "100% Recyclable" Are False.**

40.    Recycling is "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards

necessary to be used in the marketplace." Cal. Pub. Res. Code § 40180. Thus, "recyclable" products must, if discarded into a recycling bin, be: (i) accepted for collection by a recycling facility; and (ii) processed for reuse or use in manufacturing another item.

41.     In California, after plastic bottles, such as the Products, are discarded into a recycling bin, the bottles are sent to a Materials Recovery Facility ("MRF"). There are approximately 365 MRFs in the United States (75 of which operate in California). A typical MRF first sorts the plastic bottles based on color and, sometimes, size. At this point, the plastic bottles, bottle caps and labels are comingled. Once sorted, the comingled plastic is typically next shredded into smaller pieces and sent to a wash station. During the washing phase, the comingled shredded plastic is separated via a sink float separation tank, where the PET plastic, which is denser than water, sinks and the HDPE and PP plastics, which are less dense than water, float. Finally, the separated shredded plastic is then processed into "clean flake" material or plastic resin for use in manufacturing or assembling another item.

42.     PET and HDPE are widely considered to be the "most recyclable" forms of plastic. However, the most recent available data, which was published in a study by Greenpeace, indicates that as of 2017, United States domestic MRFs only have the capacity to process into plastic resin approximately: (i) 22.5% of the total post-consumer PET plastic waste generated; and (ii) 12% of the total post-consumer HDPE plastic waste generated.[7] Additionally, due to contamination and processing losses, not all PET and HDPE material that is processed by MRFs is actually converted into "clean flake" for reuse.[8] About a third of the collected PET and HDPE material processed by MRFs is not converted into "clean flake," and is instead, landfilled or incinerated.[9] Accordingly, the Products' PET bottles and HDPE bottle caps are not "100% Recyclable" because: (i) the United States lacks the

---

[7] Greenpeace, *Circular Claims Fall Flat: Comprehensive U.S. Survey of Plastic Recyclability*, https://www.greenpeace.org/usa/wp-content/uploads/2020/02/Greenpeace-Report-Circular-Claims-Fall-Flat.pdf, Section 7.2.2 (last accessed December 18, 2020).

[8] Jan Dell, *Six Times More Plastic Waste is Burned in U.S. than is Recycled* (April 30, 2020), https://www.plasticpollutioncoalition.org/blog/2019/4/29/six-times-more-plastic-waste-is-burned-in-us-than-is-recycled (last accessed June 10, 2021).

[9] *Id.*

capacity to process 77.5% of all PET and 88% of all HDPE plastic waste generated; and (ii) of the plastic that is processed by MRFs, only about 70% of the PET and HDPE is converted into "clean flake" material for reuse.

43.     PP and BOPP plastics, which are the material used to make the Products' bottle caps and film labels, respectively, are widely considered to be the least recyclable plastics. These plastics are typically collected by MRFs for #3-7 mixed bails that require further processing. However, "the economics [of processing those bails] have proven insurmountable."[10] Prior to 2018, MRFs in the United States exported #3-7 mixed bails, primarily, to China. However, on January 1, 2018, China enacted the National Sword policy that limits plastic waste imports. There is, however, minimal demand, value, and processing capacity for them in the United States. Thus, mixed plastic #3-7 bales that were "previously exported to China now have negligible to negative value across the country and 'cannot be effectively or efficiently recycled in the US.'"[11] As a result, the majority of PP and BOPP sent to recycling facilities is incinerated, which releases large quantities of greenhouse gases and toxic air emissions. This is especially true of the Products' BOPP labels, which are completely unrecyclable because they are made of plastic film that is difficult to sort and process and is typically treated as trash.

44.     Further, due to the availability of cheap raw materials to make "virgin plastic," there is very little market demand for recycled PP and BOPP plastic. Using virgin plastic to package and make products is cheaper than other materials because virgin plastic is derived from oil and natural gas. Indeed, recognizing the market potential from plastic production, major oil and natural gas companies are increasingly integrating their operations to include production of plastic resins and products, which further drives down the price of "virgin plastic." As a result, recycling facilities cannot afford the cost of breaking down and reconstituting recycled PP and BOPP plastic because there are almost no buyers of the resulting plastic, pellets, or scrap materials. Thus, the Products' PP bottle caps and BOPP labels are not "100% Recyclable" because those materials are not processed into reusable material, and are

---

[10] Greenpeace, *supra*, note 7, at Section 4.

[11] *Id.*

1    instead, sent to incinerators or landfills.

2         45.     Even when plastic bottle lids are made of HDPE (#2) plastic instead of PP (#5), a

3    significant portion of them are lost during the sorting process because they fall through disk screens

4    during the initial sorting process at the MRF. As a result, most caps are not recyclable regardless of

5    whether they are made from No. 2 or No. 5 plastic because they are too small to be efficiently sorted

6    and processed.

7         **(3) Defendants' Marketing of the Products Violates California Public Policy and the**

8         **Federal Trade Commission Green Guides.**

9         46.     The State of California has declared that "it is the public policy of the state that

10   environmental marketing claims, whether explicit or implied, should be substantiated by competent and

11   reliable evidence to prevent deceiving or misleading consumers about the environmental impact of

12   plastic products." Cal. Pub. Res. Code § 42355.5. The policy is based on the Legislature's finding that

13   "littered plastic products have caused and continue to cause significant environmental harm and have

14   burdened local governments with significant environmental cleanup costs." Cal. Pub. Res. Code §

15   42355.

16        47.     Additionally, California Business and Professions Code § 17580.5 makes it "unlawful

17   for any person to make any untruthful, deceptive, or misleading environmental marketing claim,

18   whether explicit or implied." Pursuant to that section, the term "environmental marketing claim"

19   includes any claim contained in the Guides for Use of Environmental Marketing Claims published by

20   the Federal Trade Commission (the "Green Guides"). Cal. Bus. & Prof. Code § 17580.5; *see also* 16

21   C.F.R. § 260.1, *et seq.* As detailed below, Defendants' marketing of the Products as "100%

22   Recyclable" violates several provisions of the Green Guides.

23        48.     First, Defendants' marketing of the Products as "100% Recyclable" violates the Green

24   Guides' provisions prohibiting the labeling of products as recyclable unless the products can actually be

25   converted into reusable material. Section 260.12(a) of the Green Guides provides that it is "deceptive to

26   misrepresent, directly or by implication, that a product or package is recyclable. A product or package

27   should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from

28

the waste stream through an established recycling program for reuse or use in manufacturing or assembling another item." The Green Guides further explain that "[m]arketers should clearly and prominently qualify recyclable claims to the extent necessary to avoid deception about the availability of recycling programs and collection sites to consumers." 16 C.F.R. § 260.12(b). "If recycling facilities are available to less than a substantial majority [defined as at least 60%] of consumers or communities where the item is sold, marketers should qualify all recyclable claims."16 C.F.R. § 260.12(b)(1). Further "[i]f any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive." 16 C.F.R. § 260.12(d). And in promulgating the current recycling definition, the Federal Trade Commission ("FTC") clarified that "[f]or a product to be called 'recyclable,' there must be an established recycling program, municipal or private, through which the product will be converted into, or used in, another product or package." *See* 63 Fed. Reg. 84, 24247 (May 1, 1998). As the FTC has stated, "while a product may be technically recyclable, if a program is not available allowing consumers to recycle the product, there is no real value to consumers." 63 Fed. Reg. 84, 24243 (May 1, 1998).

49.     In promulgating the most recent version of the Green Guides, the FTC stated (under the heading "Packages Collected for Public Policy Reasons but Not Recycled"), "[t]he Commission agrees that unqualified recyclable claims for categories of products that municipal recycling programs collect, but do not actually recycle, may be deceptive. To make a non-deceptive unqualified claim, a marketer should substantiate that a substantial majority of consumers or communities have access to facilities that will actually recycle, not accept and ultimately discard, the product. As part of this analysis, a marketer should not assume that consumers or communities have access to a particular recycling program merely because the program will accept a product." The California Public Resources Code similarly defines recycling as "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace." Cal. Pub. Res. Code § 40180.

50.     Defendants' marketing of the Products as "100% Recyclable" violates these provisions

of the Green Guides because it is false that 100% of the Products can be collected, separated, or otherwise recovered from the waste stream, in a substantial majority of communities where the Products are sold in California, through an established recycling program for reuse or use in manufacturing or assembling another item. Although the Products may be accepted for recycling by some curbside programs, MRFs in California do not have the capacity to: (i) process the Products' PP bottle caps and BOPP labels into reusable material because it is not cost effective and there is no end market to do so; or (ii) convert all plastic bottle material processed into reusable material because 28% of the material is contaminated or lost during processing and must be landfilled or incinerated. Further, nationally, MRFs do not have capacity to process all plastic bottles used in the United States into reusable material, such that over 75% of PET and HDPE plastics consumed must be landfilled or incinerated.

51.    Defendants' marketing of the Products as "100% Recyclable" also violates the Green Guide provisions regarding products that cannot be recycled in their entirety. Section 260.12(c) of the Green Guides provides that "Marketers can make unqualified recyclable claims for a product or package if the entire product or package, excluding minor incidental components, is recyclable. For items that are partially made of recyclable components, marketers should clearly and prominently qualify the recyclable claim to avoid deception about which portions are recyclable." Similarly, Section 260.3(b) of the Green Guides requires an environmental marketing claim to "specify whether it refers to the product, the product's packaging, a service, or just to a portion of the product, package, or service." 16 C.F.R. § 260.3(b). Defendants' "100% Recyclable" representation violates this standard of the Green Guides because it fails to specify whether it refers to the bottles, the bottle caps, or the label. The caps and the labels are not an incidental component, and even if they were, the fact that they are not recyclable makes the claim "100% Recyclable" false and misleading.

52.    Further, the Green Guides require marketers to support their claim with a reasonable basis before they make the claims. 16 CFR § 260.2 ("Marketers must ensure that all reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis before they make the claims."). "[A] firm's failure to possess and rely upon a reasonable basis for objective

claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act." *See* FTC Policy Statement Regarding Advertising Substantiation, 104 FTC 839 (1984) (cited by 16 CFR § 260.2). Defendants do not possess information sufficient to support their claims that the Products are "100% Recyclable."

**(4) Consumer Demand for "100% Recyclable" Products and Defendants' Use of Coordinated Marketing Campaigns, including the "Every Bottle Back" Initiative, to Defraud the General Public.**

53.     In recent years, consumers have become significantly more aware and sensitive to their impact on the environment through the products they purchase and use. As a result, many consumers demand products that are environmentally superior to similar products, in that these superior products cause less harm to the environment, and reduce consumers' environmental footprint. The term "green" is commonly used to describe these products. Factors important in determining that a product is environmentally superior to a similar product include the adverse impact to the environment caused by the manufacturing, use, and disposal of a product.

54.     Recent investigations into the proliferation of plastic pollution have revealed that for decades the plastic industry sold the public on the myth "that the majority of plastic could be, and would be, recycled – all while making billions of dollars selling the world new plastic."[12] On September 11, 2020, National Public Radio ("NPR") published an investigation illustrating the plastic industry's decades-long awareness that recycling would not keep plastic products or packaging out of landfills, incinerators, communities, or the natural environment.[13] In a 1974 speech, one industry insider stated "there is serious doubt that [recycling plastic] can ever be made viable on an economic basis."[14] Larry Thomas, former president of the Society of the Plastic Industry (known today as the

---

[12] Lara Sullivan, *How Big Oil Misled The Public Into Believing Plastic Would be Recycled*, NPR.ORG (Sep. 11, 2020, 5:00 a.m.), https://www.npr.org/2020/09/11/897692090/how-big-oilmisled-the-public-into-believing-plastic-would-be-recycled (last accessed Dec. 7, 2020).

[13] *Id.*

[14] *Id.*

1    Plastics Industry Association ("PLASTICS")), told NPR that "if the public thinks that recycling is

2    working, then they are not going to be as concerned about the environment."[15] The NPR investigative

3    report details the length and expense that the plastics industry went to deceive consumers about the

4    recyclability of plastics.

5         55.    Beverage manufacturers, including Defendants, have supported these efforts for years.

6    For example, until recently, Coca-Cola was a major financial supporter of PLASTICS. PLASTICS is a

7    trade association that has lobbied against bans on single-use plastic, arguing that the problem of plastic

8    waste is "behavioral rather than [a] material issue" because single-use plastics are 100% Recyclable.

9    Though PLASTICS keeps its membership rolls secret, major companies have been outed over the years

10   for their support of the organization.

11        56.    In 2018, after the implementation of National Sword, environmental organizations such

12   as the Sierra Club and Greenpeace began applying greater pressure to the plastics industry through

13   public information campaigns. The central message was that the recycling system is broken and that

14   reuse was the only truly sustainable option. For example, a January 19, 2018 press release on the

15   Greenpeace website titled *Greenpeace slams Coca-Cola plastic announcement as 'dodging the main*

16   *issue'* stated:

17        Greenpeace is urging Coca Cola to make firm commitments to cut its plastic production by
          investing in alternatives to single-use plastic bottles, including committing to expand its use of
18        new delivery methods such as Freestyle dispensers and self-serve water stations with reusable
          containers.[16]
19
20        57.    On July 23, 2019, in response to pressure from the Sierra Club and similar

21   organizations, Coca-Cola started a marketing counter-offensive. It began by announcing its "plan to

22   end their memberships with the Plastics Industry Association."[17]

23   _____

     [15] *Id.*

24   [16] Perry Wheeler, *Greenpeace slams Coca-Cola plastic announcement as 'dodging the main issue'*,
     Greenpeace (Jan. 19, 2018), https://www.greenpeace.org/usa/news/greenpeace-slams-coca-cola-plastic-
25   announcement-as-dodging-the-main-issue/ (last visited Apr. 7, 2021).

26   [17] Perry Wheeler, *Industry giants Coca-Cola and PepsiCo ditching pro-plastics lobbying association,*
     Greenpeace (Jul. 23, 2019), https://www.greenpeace.org/usa/news/industry-giants-coca-cola-and-
27   pepsico-ditching-pro-plastics-lobbying-

28

58.     On October 29, 2019—three months after breaking ties with PLASTICS—Coca-Cola,
and the American Beverage Association ("ABA") launched the "Every Bottle Back" initiative to once
again attempt to convince the public that single-use plastics are not bad for the environment. The stated
purpose of this initiative is to support what the members call the "circular plastics economy," which
perpetuates the fiction that plastic bottles are "100% Recyclable" and are part of a sustainable, circular
plastics economy. In other words, that the Products are "green." However, this media strategy is
nothing but a retooled version of their original media strategy. Instead of supporting plastic trade
groups, Defendants have found a more palatable way to achieve the same goal of deceiving the public
about the sustainability of single-use plastics. The "Every Bottle Back" campaign uses same rhetoric
championed by PLASTICS—i.e., that the problem of plastic waste is largely behavioral and can be
solved through public education that plastic bottles are 100% Recyclable.

59.     Defendants' strategy has remained unchanged: to convince the public that plastic bottles
are environmentally friendly, all while increasing profits selling the world new plastic. This is
confirmed by a recent brand audit by Break Free From Plastic, a non-governmental organization that
advocates against the use of single-use plastics. For the past three years, Break Free From Plastic has
ranked PepsiCo, Inc., Coca-Cola, and BTB as the top plastic polluters in the world. In its 2020 audit,
Break Free From Plastic reported "[d]espite clever marketing tactics and lofty 'sustainability' goals, the
same companies continue to make our list of Top Global Polluters year after year."[18]

60.     To make matters worse, during the COVID-19 crisis, as the demand for petroleum-
derived fuels dramatically decreased, the petrochemical industry tried to make up for lost revenue by
increasing sales of plastic. Environmental organizations have recognized that "the struggling fossil fuel
industry sees plastic production as a lifeline for maintaining its profits as demand in the electric and

---

association/#:~:text=Washington%2C%20DC%20%E2%80%93%20As%20pressure%20mounts,advoca
ted%20against%20plastic%20bans%20nationwide (last visited Apr. 7, 2021).

[18] Break Free From Plastic, *Branded Vol. III: Demanding Corporate Accountability for Plastic
Pollution* (2020), https://www.breakfreefromplastic.org/wp-content/uploads/2020/12/BFFP-2020-
Brand-Audit-Report.pdf (last accessed March 24, 2022).

1   transportation sector drops."[19] In turn, the plastic industry began a public relations campaign claiming

2   that using reusable products would increase the risk of contracting the virus and that consumers should

3   instead use single-use plastics.

4        61.     Defendants have been more than willing to oblige in perpetuating the falsehood that

5   their single-use plastic bottles are 100% Recyclable. The "Every Bottle Back" website includes the

6   following representations:

7

8

9   **OUR NEW INITIATIVE:**

10  **TOGETHER, WE'RE COMMITTED**
    **TO GETTING *EVERY BOTTLE***

11  ***BACK***

12  Our plastic bottles are made to be remade. We are carefully designing
    them to be 100% recyclable – even the caps. Our goal is for every bottle to

13  become a new bottle, and not end up in oceans, rivers, beaches and
    landfills. And that means we are using less new plastic.

14

    **We are making**

    **100%**

    **recyclable plastic bottles.**
    **And we want them back.**

15  https://www.innovationnaturally.org/recycling/

16

17

18

19  ─────────────────

20  [19] Hillary Larson, *The Deep Injustice of Plastic Pollution* (July 30, 2020),

21  https://www.sierraclub.org/articles/2020/07/deep-injustice-plastic-pollution (last accessed June 10,
    2021).

22

23

24

25

26

27

28

# MORE EFFICIENT RECYCLING MEANS LESS NEW PLASTIC IN OUR ENVIRONMENT.

**We're making 100% recyclable plastic bottles, and that's a critical first step. But it only helps the environment if we get them back so they don't end up in oceans, rivers and beaches. So we're working hard to support strong recovery and recycling systems across the country.**

https://www.innovationnaturally.org/plastic/

62.     The misrepresentation that plastic bottles are "100% Recyclable" is repeated throughout the website with language such as "[w]e've made our plastic bottles to be 100% recyclable, including the caps."

63.     To lend credibility to the initiative, the ABA and its partners provided over $100 million in funding to The Recycling Partnership and Closed Loop Partners. The website also references support from the World Wildlife Fund's corporation activation hub, Resource: Plastic.

64.     The most important part of the "Every Bottle Back" initiative is the coordinated use of the "100% Recyclable" claim. As the website explains, the major feature of the campaign is a "public awareness campaign to help consumers understand the value of 100% recyclable bottles" and the use of "a new voluntary on-pack message to promote the recyclability of our plastic bottles and caps." The ABA website further elaborates that the beverage makers are "[w]ork[ing] together to leverage our packaging to remind consumers that our bottles are 100% recyclable and can be remade into new bottles. Beverage companies will begin introducing voluntary messaging on packages in late 2020."

65.     All Defendants have adopted the voluntary "100% Recyclable" language as a part of a coordinated scheme to defraud the public and have benefited from the "Every Bottle Back" public awareness campaign designed to do the same.

66.     Defendants market the Products as "100% Recyclable" to capitalize on consumer demand for "green" products. In particular, Defendants intend for reasonable consumers to believe, and reasonable consumers do believe, that the Products will be recycled in their entirety if the consumer disposes of the empty bottles in a recycling bin. Further, Defendants intend for consumers to believe, and reasonable consumers do believe, that because the Products are "100% Recyclable," the bottles are specially designed to be environmentally superior to competitors' products that do not contain the same representation. Finally, Defendants intend for consumers to believe, and reasonable consumers do believe, that because the Products are part of a circular plastics economy in which all bottles are recycled into new bottles to be used again.

67.     Defendants' coordinated and illegal marketing campaign has been extremely successful. Defendants collectively sell a large percentage of the bottled water sold in the United States. The Products are sold in grocery stores, gas stations, and big box stores throughout California and the country. Because of the big potential for sales, Defendants have no incentive to stop claiming that the Products are "100% Recyclable" or change their disclaimers to discourage sales.

68.     Because consumers are led to believe the bottles are "100% Recyclable" and are superior to less environmentally-friendly plastic water bottles, and therefore purchase them because they are a "green" product, Defendants are able to charge a premium for the Products. If consumers knew that the Products were not "100% Recyclable," the product would not command a premium price based on that representation, fewer consumers would purchase them, and consumers would not pay the premium attributable to that representation.

**(5) BTB and Coca-Cola's Misrepresentations Frustrate the Sierra Club's Mission and Force It to Divert Resources.**

69.     The Sierra Club's mission is to "[t]o explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives."

70.     The Sierra Club achieves its mission by mobilizing a community of 3.8 million members, supporters, and grassroots volunteers to bring attention to practices by governments and major companies that threaten the planet. The Sierra Club rallies its volunteers through the use of petitions, protests, and other events. Additionally, the Sierra Club uses its network to pressure and advocate for change through legislation and strategic lawsuits. The Sierra Club's efforts have secured protection for hundreds of parks and monuments and led to the passage of landmark legislation such as the Clean Air Act and the Endangered Species Act. The Sierra Club has tremendous credibility and influence with the public as the oldest conservation organization in the country.

71.     Another integral component of the Sierra Club's operations in furtherance of its mission is to educate the public regarding environmental issues. It achieves this through hosting movie screenings, events, and publishing newsletters and magazines such as *Sierra*, the national magazine of the Sierra Club. The Sierra Club believes that if the public is properly informed, it will act responsibly to protect the planet.

72.     The Sierra Club's mission is directly frustrated by BTB and Coca-Cola's manufacture, sale, and false marketing of single-use plastic bottles as "100% Recyclable" for at least two reasons. First, the manufacture and use of single-use plastic bottles is detrimental to the environment because the overwhelming majority of those bottles end up in landfills or are incinerated. This negatively impacts humans, animals and ecosystems and is directly antagonistic to the Sierra Club's express mission to "protect the planet." Second, the claim that the single-use bottles are "100% Recyclable" undermines the Sierra Club's mission to "educate and enlist humanity to protect" the natural environment because it falsely implies that the use of plastic bottles is sustainable. If the public is not properly educated and informed about the consequences of their actions—that plastic bottles are not "100% Recyclable" and that a substantial portion of the bottles are not recycled, and instead, end up in rivers, waterways and landfills—they cannot make environmentally responsible choices.

73.     The Sierra Club has expended considerable resources to combat BTB and Coca-Cola's misrepresentations. In particular, during the past two years, the Sierra Club has diverted substantial

1    volunteer and staff hours to support legislation in California that prohibits false recycling claims and

2    supports the use of reusable bottles, including SB 343 and AB 962.

3         74.    SB 343, the Truth in Labeling for Recyclable Materials bill, addresses the mislabeling of

4    products as recyclable. The measure expands on the "Truth in Environmental Advertising" law that

5    prohibits the use of the word "recyclable" on unrecyclable products or any other suggestion that a

6    material is recyclable unless the material is actually recyclable in most California communities and is

7    routinely sold to make new products. The bill declares that it is the "public policy of the state that

8    claims related to the recyclability of a plastic product be truthful." Cal. Pub. Res. Code, § 42355.5

9    (proposed amendment).[20] It further requires that companies keep evidence supporting the validity of

10   any "use of a chasing arrows symbol" or claim that otherwise "direct[s] a consumer to recycle a

11   consumer good" including documentation regarding "[t]he reasons the person believes the

12   representation to be true;" "[a]ny significant adverse environmental impacts directly associated with the

13   production, distribution, use, and disposal of the consumer good;" "[a]ny measures that are taken by the

14   person to reduce the environmental impacts directly associated with the production, distribution, and

15   disposal of the consumer good;" "[v]iolation of any federal, state, or local permits directly associated

16   with the production or distribution of the consumer good;" "[w]hether, if applicable the consumer good

17   conforms with the uniform standards contained in the Federal Trade Commission Guidelines for

18   Environmental Marketing Claims for the use of the term 'recycled,' 'recyclable,' 'biodegradable,'

19   'photodegradable,' or 'ozone friendly,'" and "[i]f the person uses the term 'recyclable,' uses a chasing

20   arrows symbol, or otherwise directs consumers to recycle the consumer good, whether the consumer

21   good meets all of the criteria for statewide recyclability pursuant to Section 42355.51 of the Public

22   Resources Code." Cal. Bus. & Prof. Code § 17580 (proposed amendment). The bill further empowers

23   the state of California to create a list of the "types and forms of plastic products and packaging for

24   _____

25   [20] Proposed Text of SB 343 available at:
     https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220SB343 (last visited May

26   26, 2021).

27

28

which a claim of recyclability, including the use of a chasing arrows symbol, may be made." Cal. Pub. Res. Code, § 42355.51(d) (proposed amendment).

75.     SB 343 directly combats BTB and Coca-Cola's "100% Recyclable" claim because it places greater restrictions on the types and forms of plastic products and packaging for which a claim of recyclability can be made unless it is truly recyclable. Although California has already made it clear that deceptive environmental claims are against public policy, this bill specifically targets false recyclability claims, such as BTB and Coca-Cola's "100% Recyclable" claim, by expressly stating that it is against the public policy of the state of California to make false "claims related to the recyclability of a plastic product." Cal . Pub. Res. Code § 42355.5 (proposed amendment). Additionally, it requires BTB and Coca-Cola to, *inter alia*, keep detailed records relating to its recyclability claims.

76.     In or around March 2021, the Sierra Club internally designated the SB 343 as high-priority because of its importance in achieving the Sierra Club's mission and to counteract false recycling claims such as "100% Recyclable" that appear on the Products. The Sierra Club has since drafted and submitted a letter of formal support of the legislation and advocated in favor of the bill at legislative hearings.

77.     AB 962, the California Beverage Container Recycling and Litter Reduction Act, would provide for increased bottle deposits and a system for processing and washing reusable bottles. The purpose of this bill is to reduce waste generated from single-use bottles such as those made by BTB and Coca-Cola by creating an alternate system of reusable bottles.[21] The Sierra Club's response to BTB and Coca-Cola's deceptive practices has been, in part, to educate the public that reusable containers are the only truly sustainable way to consume water. This law provides a convenient and viable system for reusing bottles.

78.     AB 962 directly combats BTB and Coca-Cola's false "100% Recyclable" claim by offering an alternative to single-use bottles. AB 962 creates a new system so that manufacturers of

---

[21] Proposed Text of AB 962 available at:
https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202120220AB962 (last visited May 26, 2021).

water bottles can offer truly sustainable and convenient bottled water to the public and addresses the root cause of the problem, i.e., that plastic water bottles cannot be fully recycled into new materials.

79.     In or around March 2021, the Sierra Club internally designated the AB 962 as high-priority because of its importance in achieving the Sierra Club's mission and to counteract false recycling claims such as "100% Recyclable" that appear on the Products. The Sierra Club has since drafted and submitted a letter of formal support of the legislation and advocated in favor of the bill at legislative hearings.

80.     In addition to the Sierra Club's lobbying efforts, on June 1, 2021, the Sierra Club California Zero Waste Committee tweeted the following on its twitter account:

> Is this @ArrowheadWater bottle including its cap and label really 100% recyclable? Would they be recycled?
> @SierraClubCA supports SB343 Truth in Labeling for Recyclable Material
> @BenAllenCA @Laurafriedman43 @LorenaAD80

The tweet included a picture of the Arrowhead label with the "100% Recyclable" claim. This tweet was intended to inform the public regarding BTB's false claims.

81.     On June 2, 2021, the official Twitter account of BTB's Arrowhead brand (@ArrowheadWater) responded, "While not every recycling center has the same capabilities, our cap and label are 100% recyclable. That's why we ask our consumers to replace the cap and leave the label on when dropping our bottles in the recycling bin!"

82.     On June 6, 2021, the Sierra Club Angeles Chapter, in direct response to BTB and Coca-Cola's claims, drafted and published an article on its website explaining to the public and its members the importance of passing SB 343 due to false claims, such as "100% Recyclable," that appear on the Products.[22] The article specifically used photos of BTB and Coca-Cola's Products as examples of the false advertising that SB 343 is designed to combat.

83.     On June 15, 2021, the Sierra Club further disseminated the June 6, 2021 article to over

---

[22] Simone Kufhal, *Truth in Recycling*, Sierra Club Angeles Chapter Website (June 7, 2021), https://angeles.sierraclub.org/news_conservation/blog/2021/06/truth_in_recycling (last accessed June 10, 2021).

1   five hundred club members and activists using an email alert.

2       84.    These efforts were not "business as usual" for Sierra Club, as Sierra Club would not

3   have, and could not have, analyzed and specifically responded to BTB and Coca-Cola's misleading

4   label claims if they had not made those claims in the first place. Instead, Sierra Club would have used

5   those resources to continue to educate consumers and citizens on what they can do to protect our

6   environment, rather than using those resources merely to fight back against the misperceptions and

7   confusion caused by BTB and Coca-Cola's labels.

8       85.    The Sierra Club will continue to advocate on behalf of the environment and to inform

9   consumers about greenwashing and BTB and Coca-Cola's false claims so that consumers can make

10  informed purchasing decisions. If BTB and Coca-Cola's misconduct described herein is not enjoined,

11  the Sierra Club's mission will continued to be frustrated by BTB and Coca-Cola's conduct and it will

12  be forced to continue to divert resources to inform the public about the false claims on the Product

13  labels.

14                      **THE CONSUMER PLAINTIFFS' EXPERIENCES**

15      86.    Plaintiff Muto purchased three 24-packs of Dasani water bottles from Costco in La

16  Quinta, CA on or around April 15, 2021. He saw the claim "100% Recyclable" on the Products and he

17  purchased them, in part, because he believed that the entirety of the bottles, including the labels and

18  caps, could and would be recycled if he disposed of them in a recycling bin. Recycling is important to

19  Plaintiff Muto because he has children and he wishes to protect the environment for future generations.

20  He did in fact dispose of the bottles in a recycling bin. However, for the reasons discussed *supra*, the

21  bottles were not and could not be recycled in their entirety. Had he known that the Products were not

22  "100% Recyclable," he would not have purchased them, or at a minimum, he would have paid less for

23  them.

24      87.    Plaintiff Salgado purchased a 24-pack of 16.9-ounce Niagara water bottles from Numero

25  Uno Market in Los Angeles, CA on or around April 15, 2020. Plaintiff Salgado also purchased an 8-

26  pack of 12-ounce Dasani water bottles from the Target store near her home on or around April 20,

27  2021. Plaintiff Salgado saw the claim "100% Recyclable" on the Products and purchased them, in part,

28

because she believed that the entirety of the bottles, including the labels and caps, could and would be recycled if she disposed of them in a recycling bin. Recycling is important to Plaintiff Salgado and she prefers to make purchases that reduce her environmental footprint whenever possible. She did in fact dispose of the bottles in a recycling bin. However, for the reasons discussed *supra*, the bottles were not and could not be recycled in their entirety. Had she known that the Products were not "100% Recyclable," she would not have purchased them, or at a minimum, she would have paid less for them.

88.     Plaintiff Swartz purchased a bottle of Arrowhead water from a gas station in Merced County, CA on or around November 2020. Plaintiff Swartz saw the claim "100% Recyclable" on the Product and purchased it, in part, because he believed that the claim meant that the entirety of the bottle, including the label and cap, could and would be recycled if he disposed of it in a recycling bin. Recycling is important to Plaintiff Swartz and he tries to make purchases that reduce his environmental footprint whenever possible. He did in fact dispose of the bottle in a recycling bin. However, for the reasons discussed *supra*, the bottle was not and could not be recycled in its entirety. Had he known that the Product was not "100% Recyclable," he would not have purchased it, or at a minimum, he would have paid less for it.

89.     The Consumer Plaintiffs are unaware of the composition of each of the parts of the plastic bottles they purchased, and rely on the label that states that the Products are "100% Recyclable" when analyzing the Products' recyclability. Because the Consumer Plaintiffs do not know the composition of bottles now or in the future, and cannot determine whether the Products can ultimately be recycled, the Consumer Plaintiffs will be unable to rely on Defendants' labels when shopping for bottled water in the future absent an injunction that prohibits Defendants from falsely labeling their products as "100% Recyclable."

90.     The Consumer Plaintiffs continue to desire to purchase water in bottles that are "100% Recyclable" from Defendants because it is their belief that a truly "100% Recyclable" single-use water bottle would be convenient and friendlier to the environment than a water bottle that is not completely recyclable. The Consumer Plaintiffs are unable to determine if the Products are "100% Recyclable" prior to their purchase. The Consumer Plaintiffs understand that the design and composition of the

1   Products may change over time, that municipal recycling technology may change in the future, and that

2   Defendants could potentially reengineer the Products to make them truly "100% Recyclable." But as

3   long as Defendants may use the phrase "100% Recyclable" to describe plastic water bottles that are not

4   "100% Recyclable," then when presented with Defendants' packaging, the Consumer Plaintiffs

5   continue to have no way of determining whether the representation "100% Recyclable" is in fact true.

6   Thus, the Consumer Plaintiffs are likely to be repeatedly presented with false or misleading information

7   when shopping and they will be unable to make informed decisions about whether to purchase

8   Defendants' Products and will be unable to evaluate the different prices between Defendants' bottled

9   water and their competitors' bottled water. The Consumer Plaintiffs are further likely to be repeatedly

10   misled by Defendants' conduct, unless and until Defendants are compelled to ensure that their bottled

11   water marketed as "100% Recyclable" is in fact 100% recyclable.

12                          **THE CONSUMER PLAINTIFFS' CLASS ALLEGATIONS**

13          91.     The Consumer Plaintiffs bring this action against Defendants on behalf of themselves

14   and all others similarly situated, as a class action pursuant to section 382 of the California Code of Civil

15   Procedure and section 1781 of the California Civil Code. The Consumer Plaintiffs seek to represent two

16   Classes of similarly situated persons, defined as follows:

17          California Class: All persons who, between June 16, 2017 and the present, purchased the
            Products in California.
18

19          Niagara Class: All persons who, between June 16, 2017 and the present, purchased in the
            United States Products manufactured by Niagara.
20

21          92.     The following persons and entities are excluded from the Classes: Defendants and their

22   officers, directors, employees, subsidiaries, and affiliates; and all judges assigned to this case and any

23   members of their immediate families.

24          93.     This action has been brought and may properly be maintained as a class action against

25   Defendants pursuant to the provisions of California Code of Civil Procedure section 382 because there

26   is a well-defined community of interest in the litigation and the proposed Classes are easily

27   ascertainable.

28

94.     Numerosity: The Consumer Plaintiffs do not know the exact size of the Classes, but it is estimated that each of them is composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

95.     Common Questions Predominate: This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led Defendants' customers to believe that the Products are "100% Recyclable." The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. Among the questions of law and fact common to the Classes are:

a)     Whether Defendants' Products are "100% Recyclable;"

b)     Whether Defendants unfairly, unlawfully and/or deceptively represented that the Products are "100% Recyclable" and/or failed to inform class members that the Products are not "100% Recyclable;"

c)     Whether Defendants' advertising and marketing of the Products sold to class members was likely to deceive class members or was unfair;

d)     Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

e)     The amount of the premium lost by class members as a result of such wrongdoing;

f)     Whether class members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

g)     Whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

96.     Typicality: The Consumer Plaintiffs' claims are typical of the Classes because each of them purchased the Products on one or more occasions during the last four years, in reliance on

Defendants' misrepresentations and omissions that the Products are "100% Recyclable." Thus, the Consumer Plaintiffs and class members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each class member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

97.    Adequacy: The Consumer Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. The Consumer Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of class members. The Consumer Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and the interests of the Classes. By prevailing on their own claim, the Consumer Plaintiffs will establish Defendants' liability to all class members. The Consumer Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and the Consumer Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

98.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

99.     The Consumer Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

100.     Plaintiffs do not plead, and hereby disclaim, any causes of action under any regulations promulgated by the FTC. Plaintiffs rely on these regulations only to the extent such regulations have been separately enacted as state law or regulations or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## FIRST CAUSE OF ACTION

**Violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.***

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants)**

101.     The Consumer Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

102.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, *et seq*. ("CLRA").

103.     Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

104.     The Consumer Plaintiffs and other California Class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

105.     The Products that the Consumer Plaintiffs (and others similarly situated class members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a).

106.     By engaging in the actions, representations and conduct set forth in this Complaint, Defendants have violated, and continue to violate, § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations

that the goods they sell are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendants have disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised. Specifically, in violation of sections 1770 (a)(2), (a)(5), (a)(7) and (a)(9), Defendants' acts and practices led customers to falsely believe that their Products are "100% Recyclable." In violation of section 1770(a)(8), Defendants falsely or deceptively market and advertise that, unlike products not specifically denominated as "100% Recyclable," the Products are "100% Recyclable," when in fact, they are not "100% Recyclable."

107.    The Consumer Plaintiffs request that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendants are not restrained from engaging in these types of practices in the future, the Consumer Plaintiffs and the other members of the California Class will continue to suffer harm.

108.    **CLRA § 1782 NOTICE.** On or around September 21, 2021, the Consumer Plaintiffs provided Defendants with notice and demand that within thirty (30) days from that date, Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Defendants failed to take any of the requested actions within thirty days. The Consumer Plaintiffs seek, pursuant to California Civil Code § 1780(a), on behalf of themselves and those similarly situated members of the California Class, actual damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices. With regard to the amount of damages and restitution, the Consumer Plaintiffs seek to recover for themselves and the California Class a full refund of the price paid for the Products, or in the alternative, the price premium paid for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis.

109.    The Consumer Plaintiffs also request that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**SECOND CAUSE OF ACTION**

**False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL")**

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on Behalf of the Sierra Club against Coca-Cola and BTB)**

110.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

111.    Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the initial filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

112.    Defendants made representations and statements (by omission and commission) that led reasonable consumers to believe that they were purchasing products that were "100% Recyclable." Defendants deceptively failed to inform the Consumer Plaintiffs, those similarly situated, and the general public, that the Products are not "100% Recyclable."

113.    The Consumer Plaintiffs, those similarly situated, and the general public relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had the Consumer Plaintiffs, those similarly situated, and the general public been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing the Products or paying less for them.

114.    Defendants' acts and omissions are likely to deceive reasonable consumers and the general public.

115.    Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

116.    The aforementioned practices, which Defendants have used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

117.    As a direct and proximate result of such actions, the Consumer Plaintiffs and the California Class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, the Consumer Plaintiffs and the California Class members paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, the Consumer Plaintiffs and the California Class members will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

118.    Additionally, as a direct and proximate result of BTB and Coca-Cola's actions, Plaintiff Sierra Club has suffered and continues to suffer injury in fact and has lost money and/or property as a result of such false, deceptive and misleading advertising in an amount in excess of the jurisdictional minimum of this Court. Specifically, the Sierra Club has diverted significant resources to combat BTB and Coca-Cola's misleading and false recycling claims.

119.    The Consumer Plaintiffs seek equitable relief, including restitution, with respect to their FAL claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), the Consumer Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. The Consumer Plaintiffs and the California Class members may be unable to obtain monetary, declaratory and/or injunctive relief directly under their other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because the Consumer Plaintiffs may not be able to establish each class member's individualized understanding of Defendants' misleading representations, but the FAL does not require individualized proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC,* 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception,

reliance, and injury.'"). In addition, the Consumer Plaintiffs and the California Class members may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if the Consumer Plaintiffs are unable to demonstrate the requisite mens rea (intent, reckless, and/or negligence), because the FAL imposes no such mens rea requirement and liability exists even if Defendants acted in good faith.

120.    The Consumer Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising with respect to all Defendants.

121.    Plaintiff Sierra Club seeks a declaration that the above-described practices constitute false, misleading and deceptive advertising with respect to BTB and Coca-Cola.

122.    The Consumer Plaintiffs seek, on behalf of themselves and the California Class members, an injunction against all Defendants prohibiting the sale of the Products within a reasonable time after entry of judgment, unless the Products' packaging and marketing is modified to remove the misrepresentation "100% Recyclable" and to disclose the omitted facts about their true recyclability. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. The Consumer Plaintiffs and the California Class members have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

123.    Plaintiff Sierra Club seeks an injunction against Coca-Cola and BTB prohibiting the sale of the Products within a reasonable time after entry of judgment, unless the Products' packaging and marketing is modified to remove the misrepresentation "100% Recyclable" and to disclose the omitted facts about their true recyclability. Plaintiff Sierra Club has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Coca-Cola and BTB's

1   deceptive advertising. Such misconduct by BTB and Coca-Cola, unless and until enjoined and

2   restrained by order of this Court, will continue to cause injury in fact to Plaintiff Sierra Club because

3   the misconduct will continue to frustrate its purposes and the Sierra Club will be forced to continue to

4   divert resources to combat BTB and Coca-Cola's false claims. This expectation of future violations will

5   require Plaintiff Sierra Club to repeatedly and continuously seek legal redress in order to recover

6   monies lost as the result of BTB and Coca-Cola's actions. Plaintiff Sierra Club has no other adequate

7   remedy at law to ensure future compliance with the California Business and Professions Code alleged

8   to have been violated herein.

9                                   **THIRD CAUSE OF ACTION**

10                                **Fraud, Deceit and/or Misrepresentation**

11   **(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on**

12              **Behalf of Plaintiff Salgado and the Niagara Class against Niagara)**

13          124.    The Consumer Plaintiffs reallege and incorporate by reference the paragraphs of this

14   Complaint as if set forth herein.

15          125.    For the last three years, Defendants have fraudulently and deceptively led the Consumer

16   Plaintiffs and members of the Classes to believe that the Products are "100% Recyclable." Defendants

17   also failed to inform the Consumer Plaintiffs and members of the Classes that the Products are not

18   "100% Recyclable," that approximately 30% of PET plastic recycled is lost due to contamination

19   during the recycling process, that it is economically infeasible to recycle the bottle caps and plastic film

20   labels, and that the bottle caps and plastic film labels must be disposed or incinerated. Thus,

21   Defendants' claim that the Products are "100% Recyclable" is false.

22          126.    Defendants knew that the "100% Recyclable" representation on the Products was false

23   when they made it or they made the representation recklessly without regard for its truth because

24   Defendants engineered and manufactured the Products and reasonably should have investigated

25   whether the Products were "100% Recyclable" before marketing them as such.

26          127.    These misrepresentations and omissions were material at the time they were made. They

27   concerned material facts that were essential to the analysis undertaken by the Consumer Plaintiffs and

28

members of the Classes as to whether to purchase the Products.

128.    Defendants made identical misrepresentations and omissions to members of the Classes regarding the Products.

129.    The Consumer Plaintiffs and those similarly situated reasonably relied to their detriment on Defendants' fraudulent misrepresentations and omissions. Had the Consumer Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

130.    Defendants had a duty to inform the Consumer Plaintiffs and members of the Classes at the time of their purchases that the Products were not "100% Recyclable," that approximately 30% of PET plastic recycled is lost due to contamination during the recycling process, that it is economically infeasible to recycle the bottle caps and plastic film labels, and that the bottle caps and plastic film labels must be disposed or incinerated. Defendants failed to provide this information to class members. Class members relied to their detriment on Defendants' omissions. These omissions were material to the decisions of the class members to purchase the Products. In making these omissions, Defendants breached their duty to class members. Defendants also gained financially from, and as a result of, their breach.

131.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce the Consumer Plaintiffs, and those similarly situated, to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced the Consumer Plaintiffs, and those similarly situated, to, without limitation, pay a premium to purchase the Products.

132.    As a direct and proximate result of Defendants' misrepresentations and omissions, the Consumer Plaintiffs, and those similarly situated, have suffered damages. In particular, the Consumer Plaintiffs seek to recover on behalf of themselves and those similarly situated the price premium paid for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis.

133.    Defendants' conduct as described herein was  willful and malicious and was designed to

maximize Defendants' profits even though Defendants knew that it would cause loss and harm to the Consumer Plaintiffs and those similarly situated.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on Behalf of Plaintiff Salgado and the Niagara Class against Niagara)**

134.    The Consumer Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

135.    For the last three years, Defendants provided false and misleading information regarding the Products, representing that they were "100% Recyclable."

136.    These representations were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by the Consumer Plaintiffs and members of the Classes as to whether to purchase the Products.

137.    Defendants made identical misrepresentations and omissions to members of the Classes regarding the Products.

138.    Defendants should have known their representations to be false and had no reasonable grounds for believing them to be true when they were made.

139.    By and through such negligent misrepresentations, Defendants intended to induce the Consumer Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants negligently induced the Consumer Plaintiffs, and those similarly situated, without limitation, to purchase the Products.

140.    The Consumer Plaintiffs, and those similarly situated, relied to their detriment on Defendants' negligent misrepresentations. Had the Consumer Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

141.    The Consumer Plaintiffs and those similarly situated have suffered damages. In particular, the Consumer Plaintiffs seek to recover on behalf of themselves and those similarly situated

the price premium paid for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis.

## FIFTH CAUSE OF ACTION

### Unfair, Unlawful and Deceptive Trade Practices,
### Business and Professions Code § 17200, *et seq.*

### (On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on Behalf of the Sierra Club against Coca-Cola and BTB)

142.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

143.    Within four (4) years preceding the initial filing of the Class Action Complaint, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, deceptive and unlawful business practices outlined in this Complaint.

144.    In particular, Defendants have engaged, and continue to engage, in deceptive practices, in violation of the Unfair Competition Law, California Business & Professions Code § 17200, *et seq.* (the "UCL"), by, without limitation:

    a.    deceptively representing that the Products are "100% Recyclable;" and

    b.    failing to disclose that the Products are not "100% Recyclable."

145.    Defendants' claims that the Products are 100% recyclable are material, untrue, and misleading. These recyclable claims are prominent on all of the Products' marketing, advertising, and labeling materials, even though Defendants are aware that the claims are false and misleading. Defendants' claims are thus likely to deceive reasonable consumers.

146.    Defendants have engaged, and continue to engage, in unfair practices, in violation of the UCL, by, without limitation:

    a.    deceptively representing that the Products are "100% Recyclable;"

1      b.     failing to disclose that the Products are not "100% Recyclable;"

2      c.     contravening and undermining state policies expressed in Cal. Pub. Res. Code § 42355 ( "[u]se of the term 'degradable,' 'biodegradable,' 'decomposable,' or other like terms on plastic products is inherently misleading unless the claim includes a thorough disclaimer providing necessary qualifying details, including, but not limited to, the environments and timeframes in which the claimed action will take place") and § 42355.5 (it is "the public policy of [California] that environmental marketing claims, whether explicit or implied, should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers about the environmental impact of plastic products"); and

d.     contravening and undermining state and local policies in favor of recycling, recycling programs, and reducing the amount of plastic in landfills and the amount of pollution from plastic in the environment.

147.    Additionally, Defendants have engaged, and continue to engage, in unlawful practices, in violation of the UCL, by, without limitation:

a.     violating the Federal Trade Commission Green Guides regulations, including, without limitation, 16 C.F.R. §§ 260.3(b), 260.3(c), 260.12(b), 260.12(c), 260.12(d), 260.16(c), 260.1, and 260.2, as described herein;

b.     violating the Environmental Marketing Claims Act, including, without limitation, Cal. Bus. & Prof. Code §§ 17580(a) (Defendants have not maintained in written form in their records information and documentation supporting the validity of their representation) and 17580.5(a) (Defendants' representations and omissions complained of herein constitute untruthful, deceptive, or misleading environmental marketing claims) as described herein (collectively, "Greenwashing");

c.     violating Cal. Pub. Res. Code §§ 42355 and 42355.5;

d.     violating the CLRA as described herein; and

1          e.      violating the FAL as described herein.

2      148.    The Consumer Plaintiffs and those similarly situated relied to their detriment on

3   Defendants' unfair, deceptive and unlawful business practices. Had the Consumer Plaintiffs and those

4   similarly situated been adequately informed and not deceived by Defendants, they would have acted

5   differently by not purchasing (or paying less for) the Products.

6      149.    Defendants' acts and omissions are likely to deceive reasonable consumers and the

7   general public.

8      150.    Defendants engaged in these unfair practices to increase their profits. Accordingly,

9   Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et*

10  *seq.* of the California Business and Professions Code.

11     151.    The aforementioned practices, which Defendants have used to their significant financial

12  gain, also constitute unlawful competition and provide an unlawful advantage over Defendants'

13  competitors as well as injury to the California Class members and the general public.

14     152.    As a direct and proximate result of Defendants actions, the Consumer Plaintiffs, and

15  other members of the California Class, have suffered and continue to suffer injury in fact and have lost

16  money and/or property as a result of such deceptive and/or unlawful trade practices and unfair

17  competition in an amount which will be proven at trial, but which is in excess of the jurisdictional

18  minimum of this Court. In particular, the Consumer Plaintiffs and those similarly situated paid a price

19  premium for the Products, i.e., the difference between the price consumers paid for the Products and the

20  price that they would have paid but for Defendants' misrepresentation. This premium can be

21  determined by using econometric or statistical techniques such as hedonic regression or conjoint

22  analysis. Alternatively, the Consumer Plaintiffs and those similarly situated will seek a full refund of

23  the price paid upon proof that the sale of the Products was unlawful.

24     153.    Additionally, as a direct and proximate result of BTB and Coca-Cola's actions, Plaintiff

25  Sierra Club has suffered and continues to suffer injury in fact and has lost money and/or property as a

26  result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will

27  be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Specifically,

28

Sierra Club has diverted significant resources to combat BTB and Coca-Cola's misleading and false recycling claims.

154.    The Consumer Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendants as result of Defendants' conduct. The Consumer Plaintiffs and the California Class members lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct. The Consumer Plaintiffs and the California Class similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the FTC Green Guides, Environmental Claims Marketing Act, and California Public Resources Code do not provide a direct cause of action, so the Consumer Plaintiffs and the California Class must allege those violations as predicate acts under the UCL to obtain relief.

155.    The Consumer Plaintiffs also seeks equitable relief, including restitution, with respect to their UCL unlawfulness claims for violations of the CLRA, FAL and their UCL deceptiveness claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), the Consumer Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action in the event that such causes of action do not succeed. The Consumer Plaintiffs and the California Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because the Consumer Plaintiffs may not be able to establish each class member's individualized understanding of Defendants' misleading representations of this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members.  *See, e.g., Stearns v Ticketmaster,* 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, the Consumer Plaintiffs and the California Class may be unable to obtain such relief under other causes of

1    action and will lack an adequate remedy at law, if the Consumer Plaintiffs are unable to demonstrate

2    the requisite mens rea (intent, reckless, and/or negligence), because the UCL imposes no such mens rea

3    requirement and liability exists even if Defendants acted in good faith.

4         156.    The Consumer Plaintiffs seek on behalf of themselves and those similarly situated, a

5    declaration that the above-described trade practices are fraudulent and/or unlawful with respect to all

6    Defendants.

7         157.    Plaintiff Sierra Club seeks a declaration that the above-described trade practices are

8    fraudulent and/or unlawful with respect to BTB and Coca-Cola.

9         158.    The Consumer Plaintiffs seek on behalf of themselves and those similarly situated, an

10   injunction against all Defendants prohibiting the sale of the Products within a reasonable time after

11   entry of judgment, unless the Products' packaging and marketing is modified to remove the

12   misrepresentation "100% Recyclable" and to disclose the omitted facts about their true recyclability.

13   The Consumer Plaintiffs and the California Class members have no adequate remedy at law for the

14   injuries currently being suffered as an award of monetary damages would not prohibit Defendants'

15   unlawful acts. Such misconduct by Defendants, unless and until enjoined and restrained by order of this

16   Court, will continue to cause injury in fact to the general public and the loss of money and property in

17   that Defendants will continue to violate the laws of California, unless specifically ordered to comply

18   with the same. This expectation of future violations will require current and future consumers to

19   repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which

20   they were not entitled. The Consumer Plaintiffs and the California Class members have no other

21   adequate remedy at law to ensure future compliance with the California Business and Professions Code

22   alleged to have been violated herein.

23        159.    Plaintiff Sierra Club seeks an injunction against Coca-Cola and BTB prohibiting the sale

24   of the Products within a reasonable time after entry of judgment, unless the Products' packaging and

25   marketing is modified to remove the misrepresentation "100% Recyclable" and to disclose the omitted

26   facts about the Products' true recyclability. Plaintiff Sierra Club has no adequate remedy at law for the

27   injuries currently being suffered as an award of monetary damages would not prohibit Coca-Cola and

28

BTB's unlawful acts. Such misconduct by BTB and Coca-Cola, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to Sierra Club because it will be forced to continue to divert resources to combat BTB and Coca-Cola's false claims. This expectation of future violations will require Plaintiff Sierra Club to repeatedly and continuously seek legal redress in order to recover monies lost as the result of BTB and Coca-Cola's action. Plaintiff Sierra Club has no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## PRAYER FOR RELIEF

WHEREFORE, the Consumer Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgment against all Defendants as follows:

A.      Certification of the proposed Classes, including appointment of Plaintiffs' counsel as class counsel;

B.      An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      An award of compensatory damages in an amount to be determined at trial;

D.      An award of statutory damages in an amount to be determined at trial;

E.      An award of punitive damages in an amount to be determined at trial;

F.      An award of treble damages;

G.      An award of restitution in an amount to be determined at trial;

H.      An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

H.      For reasonable attorney's fees and the costs of suit incurred; and

I.      For such further relief as this Court may deem just and proper.

WHEREFORE, Plaintiff Sierra Club respectfully requests that the Court enter judgment against BTB and Coca-Cola as follows:

A.      An order temporarily and permanently enjoining BTB and Coca-Cola from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this

Complaint;

B.      For reasonable attorney's fees and the costs of suit incurred; and

C.      For such further relief as this Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: March 24, 2022          **GUTRIDE SAFIER LLP**

_/s/ Marie A. McCrary_
Marie A. McCrary, Esq.
Seth A. Safier, Esq.
100 Pine Street, Suite 1250
San Francisco, California 94111

Attorneys for Plaintiffs

CONSOLIDATED CLASS ACTION COMPLAINT

# Exhibit A

**EXHIBIT A**

I, Marcelo Muto, declare:

1.      I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2015.5 and California Civil Code section 1780(d).

3.      I purchased 3 24-packs of Dasani water bottles in Riverside County, California. My most recent date of purchase was approximately on or around April 15, 2021.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 28th day of April 2021, in Indio, California.



DocuSigned by:

*Marcelo Muto*

BC9FDA1EA6D24D1...

Marcelo Muto

MUTO DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

DocuSign Envelope ID: E003B533-0B64-42CE-B1DF-07AEF392A829

## EXHIBIT A

I, Cristina Salgado, declare:

1.     I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.     I submit this Declaration pursuant to California Code of Civil Procedure section 2015.5 and California Civil Code section 1780(d).

3.     I purchased a 24-pack of Niagara water bottles in Los Angeles County, California. My most recent date of purchase was approximately on or around April 10, 2021.

4.     I purchased an 8-pack of Dasani water bottles in Los Angeles County, California. My most recent date of purchase was approximately on or around April 20, 2021.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 28th day of April 2021, in Los Angeles, California.


DocuSigned by:

Cristina Salgado
CD28245A4B6941E...

Cristina Salgado

-1-

SALGADO DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

DocuSign Envelope ID: 98EE9680-D8F5-4A79-A621-B16DFF29258D

**EXHIBIT A**

I, David Swartz, declare:

1.    I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.    I submit this Declaration pursuant to California Code of Civil Procedure section 2015.5 and California Civil Code section 1780(d).

3.    I purchased a 20-once bottle of Arrowhead water in Merced County, California. My most recent date of purchase was approximately on or around November 15, 2020.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 13th day of May 2021, in Oakland, California.



DocuSigned by:

F84B95A8CD184CB...

David Swartz

-1-

SWARTZ DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION