**GUTRIDE SAFIER LLP**
MARIE A. MCCRARY (Bar No. 262670)
marie@gutridesafier.com
SETH A. SAFIER (Bar No. 197427)
seth@gutridesafier.com
RAJIV V. THAIRANI (Bar No. 344390)
rajiv@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCELO MUTO, CRISTINA SALGADO, and DAVID SWARTZ, on behalf of themselves and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE COCA-COLA COMPANY, BLUETRITON BRANDS, INC., and NIAGARA BOTTLING, LLC, <br><br> Defendants. | Lead Case No.: 3:21-cv-04643-JD <br><br> **SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; NEGLIGENT MISREPRESENTATION; AND UNFAIR, UNLAWFUL, AND DECEPTIVE BUSINESS PRACTICES** <br><br> JURY TRIAL DEMANDED <br><br> HON. JAMES DONATO |
| SIERRA CLUB, <br><br> Plaintiff, <br><br> v. <br><br> THE COCA-COLA COMPANY and BLUETRITON BRANDS, INC., <br><br> Defendants. | Case No.: 3:21-cv-04644-JD |

Plaintiffs Marcelo Muto, Cristina Salgado, and David Swartz (collectively, the "Consumer Plaintiffs"), by and through their counsel, bring this Second Amended Class Action Complaint ("Complaint") against Defendants The Coca-Cola Company ("Coca-Cola"), BlueTriton Brands, Inc. (formerly known as Nestle Waters North America, Inc.) ("BTB") and Niagara Bottling LLC ("Niagara") on behalf of themselves and similarly situated persons.[1]

Plaintiff Sierra Club (the "Sierra Club"), on behalf of itself, brings this Second Amended Complaint against Coca-Cola and BTB.[2] The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

## INTRODUCTION

1.      This Complaint seeks to remedy Defendants' unlawful, unfair, and deceptive business practices with respect to the advertising, marketing, and sale of water bottled in single-use plastic bottles labeled as "100% Recyclable." Defendants label the Products as "100% Recyclable," but these representations are false, misleading, and likely to deceive reasonable consumers because the Products are not 100% recyclable.

2.      In its Guides for Use of Environmental Marketing Claims ( "Green Guides"), the Federal Trade Commission (the "Commission" or "FTC") has codified when certain label claims, including the claim "Recyclable," may be used without misleading reasonable consumers. According to the Green Guides, a product may be labeled as "Recyclable" if recycling facilities for the product are available to a substantial majority (60% or more) of consumers or communities where the products are sold. 16 C.F.R. § 260.12(b)(1). The facilities must actually recycle the products and cannot accept and ultimately discard the products. FTC, Green Guides, Statement of Basis and Purpose, p. 174 (Oct. 1, 2012). A product may be labeled as "recyclable" even if "minor incidental components" of the product fail to meet the definition of recyclable. 16 C.F.R. § 260.12(c), *see also* § 260.3 Example 2 (describing a bottle cap as a "minor incidental component" of a soft drink bottle).

---

[1] The Consumer Plaintiffs and the Sierra Club are collectively referred to herein as "Plaintiffs." Coca-Cola, BTB, and Niagara are collectively referred to herein as "Defendants."

[2] Notwithstanding any allegation or statement in the Complaint, Sierra Club does not assert any claims against, and seeks no relief from, Defendant Niagara Bottling LLC.

3.      Defendants do not fall within the Green Guides safe harbor.  Instead of calling their Products "Recyclable," they label them "***100%*** Recyclable" (emphasis added). The addition of the "100%" language suggests to consumers that the Products exceed the ordinary standard of "Recyclability."

4.      Reasonable consumers understand "100% Recyclable" to mean that the entirety of the Product is comprised of material that is recyclable, ***including*** incidental components such as caps and labels. Further, reasonable consumers understand that "100% Recyclable" means that the entirety of the Product, ***including*** the label and cap, will ***actually be*** recycled if it is properly of disposed of in a recycling bin. The statement "100% Recyclable" is false because the entirety of the Product is not comprised of material that is recyclable, and recycling facilities that are able to recycle the entirety of the Products are not available to a substantial majority of communities and consumers in California. Indeed, there are no recycling facilities in California that are capable of recycling 100% of the Product.

5.      Further, the Products are not "100%" recyclable, because (1) recycling facilities in California do not recycle Defendants' polypropylene ("PP") and high-density polyethylene ("HDPE") bottle caps, (2) recycling facilities in California cannot recycle the biaxially oriented polypropylene ("BOPP") plastic labels on the bottles, and (3), on average, 28% of each bottle sent to recycling facilities in California cannot be processed due primarily to contamination in the waste stream and ends up in landfills or burned. Indeed, Leon Farhnik, the former CEO of CarbonLite Industries, which owned and operated the largest bottle reclaiming facility in California described the process, explaining: "[f]rom the time it starts till it ends, as a resin—as a material—you lose about 30% of it in caps, in labels, in dirt. And we end up with only 70% of what we get in."[3] Defendants deceptively omit these material facts regarding the true recyclability of the Products.

6.      Plaintiffs engaged an independent firm to execute a survey of California consumers, each of whom reported purchasing bottled water in the last 6 months, as to their understanding of the label "100% Recyclable" on Defendants' Products. More than ***90%*** of respondents who viewed an

---

[3] Derrick Shore, *CarbonLite: Inside the World's Largest Plastic Bottle Recycling Plant*, KCET, https://www.kcet.org/shows/socal-connected/clip/carbonlite-inside-the-worlds-largest-plastic-bottle-recycling-plant.

example of Defendants' packaging believed that the label meant that the entire bottle, ***including labels and caps are recyclable***. Further, ***86.7%*** of respondents believed that the label meant that the ***entire product,*** including bottle, label and cap, ***would actually be recycled by facilities in the state of California*** if it is properly disposed of in a recycling bin. And, when shown identical Products bearing the label "Recyclable" or "100% Recyclable," ***61.6%*** of respondents believed that the Products labeled "100% Recyclable" were "more capable of being completely recycled" than Products labeled "Recyclable."

7.      The survey evidence is consistent with the views of state authorities, including the California Attorney General, that consumers understand "recyclable" claims to mean that products actually *will be* recycled if disposed in a recycling bin, and that "100% recyclable" claims are promises of an even higher standard: that the ***entirety*** of the products will be completely recycled if properly disposed. In a letter submitted to the FTC in connection with the Commission's decennial regulatory review of the Green Guides, the Attorneys General of California, Connecticut, Delaware, Illinois, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, Wisconsin, Massachusetts, Pennsylvania, and the District of Columbia sent a joint comment to the FTC in which, *inter alia*, they criticized this Court's earlier opinion in *Swartz v. Coca-Cola, Co.*, No. 21-CV-04643-JD (N.D. Cal. Nov. 17, 2022) because it adopted a definition of recyclability inconsistent with the Green Guides that was based on theoretical recyclability rather than actual capabilities of established recycling programs.

8.      Defendants' use of misleading and deceptive "100%" recyclability claims on their Products serves to defraud the public about plastic water bottles. It falsely informs consumers that they are not generating any waste when they choose to purchase and dispose of Defendants' plastic water bottles through a municipal recycling program. In truth, Defendants' single-use plastics are damaging the environment and generate significant waste even when consumers properly dispose of the bottles in a recycling bin because the bottles are not comprised entirely—i.e., 100% as claimed—of materials that can be recycled by established programs. If consumers knew the truth of the matter, they could make more informed decisions about consuming products that do not generate waste. Defendants'

representations that the Products are "100% Recyclable" are material, false, misleading, and likely to deceive members of the public. These representations also violate California's legislatively declared policy against misrepresenting the environmental attributes of products.

9. The Consumer Plaintiffs seek an injunction, against all Defendants, precluding the sale of the plastic bottled water within a reasonable time after entry of judgment, unless the Products' packaging and marketing are modified to remove the "100% Recyclable" misrepresentation and to disclose the omitted facts about their true recyclability. Plaintiff Sierra Club seeks an identical injunction with respect to BTB and Coca-Cola. The Consumer Plaintiffs additionally seek restitution and/or damages from all Defendants on behalf of themselves and those similarly situated, namely the price premium they paid for the Products—i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentations—in an amount to be proven at trial using econometric or statistical techniques, such as hedonic regression or conjoint analysis.

## **PARTIES**

10. Plaintiff Marcelo Muto is, and at all times alleged in this Complaint was, an individual and a resident of Indio, California.

11. Plaintiff Cristina Salgado is, and at all times alleged in this Complaint was, an individual and a resident of Los Angeles, California.

12. Plaintiff David Swartz is, and at all times alleged in this Complaint was, an individual and a resident of Oakland, California.

13. Plaintiff Sierra Club was founded in 1892 and is the nation's oldest grassroots environmental organization. The Sierra Club is incorporated in California, and has its headquarters in Oakland, California. It has more than 784,000 members nationwide. The Sierra Club's mission is "[t]o explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives." Consistent with its mission, the Sierra Club is dedicated to the protection and preservation of the

environment, including but not limited to, ending the use of single-use plastics and combatting false and misleading environmental claims on consumer goods (i.e., "greenwashing").

14.    Defendant The Coca-Cola Company is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Atlanta, Georgia.

15.    Defendant BlueTriton Brands, Inc. is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Stamford, Connecticut. BlueTriton Brands, Inc. is the successor entity to Nestle Waters North America, Inc.

16.    Defendant Niagara Bottling, LLC is a corporation organized and existing under the laws of the state of Delaware, having its principal place of business in Ontario, California.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over the Consumer Plaintiffs and the putative Classes' claims against Defendants pursuant to 28 U.S.C. § 1332(d)(2) because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one Consumer Plaintiff is a citizen of a different state than at least one Defendant.

18.    This Court has subject matter jurisdiction over the Sierra Club's claims against BTB and Coca-Cola pursuant to 28 U.S.C. § 1332(a) because the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs; and there is complete diversity of citizenship between the Sierra Club and Coca-Cola and BTB.

19.    This action was originally filed as two separate actions, *Swartz v. The Coca-Cola Co.*, No. 21-4643 (N.D. Cal) and *Sierra Club v. The Coca-Cola Company*, No. 21-4644 (N.D. Cal.). The former action was initiated by the Consumer Plaintiffs against Defendants alleging federal subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2). The latter action was initiated by the Sierra Club against BTB and Coca-Cola alleging federal diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). On March 3, 2022, this Court ordered consolidation of the two actions. Sierra Club makes no claims against and seeks no relief from Niagara. Consolidation does not defeat diversity jurisdiction when each constituent case in a consolidated action separately meets jurisdictional requirements. *See Continental Airlines v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1523 n.1 (9th Cir. 1987) ("[T]he

consolidation of the cases below did not 'make those who are parties in one suit parties in another.'" (quoting *Johnson v. Manhattan Ry.*, 289 U.S. 479, 497 (1933))); *United States v. Cole*, 563 F.2d 35, 38 (2d Cir. 1977) ("[C]onsolidation does not change the rights of the parties in the separate suits . . . [w]e must therefore consider the jurisdictional basis of each complaint separately.").

20.     This action is brought by Plaintiffs pursuant, *inter alia*, to the California Business and Professions Code, section 17200, *et seq.* Plaintiffs and Defendants are "persons" within the meaning of the California Business and Professions Code, section 17201.

21.     The injuries, damages and/or harm upon which this action is based occurred in or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California, including within this District.

22.     The claims in this case arise out of Defendants' California-related activities. Defendants market and sell the Products in California to California consumers. While the Products are marketed and sold in California by Defendants, the Products are not 100% recyclable in California. The Sierra Club has spent significant money, staff time, and other organizational resources in California to counter Defendants' false and misleading recyclability representations. Thus, the conduct alleged herein arises out of Defendants' activities in California.

23.     As a direct and proximate result of Defendants' actions in the state of California, the Consumer Plaintiffs and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property. The Consumer Plaintiffs have suffered injury in fact in the price premium they paid for Products—the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentations.

24.     As a direct and proximate result of BTB and Coca-Cola's actions in the state of California, Plaintiff Sierra Club has suffered and continues to suffer, injury in fact and has lost money and/or property. Specifically, Plaintiff Sierra Club suffered an injury in fact and has standing to bring

this action because Defendants' misrepresentations regarding the environmental benefits of their Products by marketing and selling the Products as "100% recyclable" in California have frustrated the Sierra Club's organizational mission to "protect the wild places of the earth" and to "educate and enlist humanity to protect . . . the natural and human environment." Before this litigation was initiated, the Sierra Club expended money, staff time, and diverted organizational resources in California in response to that frustration of purpose (described in greater detail *infra*). The Sierra Club's diversion of resources to respond to Defendants' misrepresentations regarding the recyclability of the Products has caused the Sierra Club to postpone other projects that could advance the Sierra Club's mission. Thus, the Sierra Club has lost money or property and has suffered an injury in fact due to Defendants' actions of using false, misleading and deceptive labels regarding the recyclability of the Products in California.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

26.     In accordance with California Civil Code section 1780(c), the Consumer Plaintiffs filed declarations establishing that, on multiple occasions since November 2020, they purchased the Products in Merced County, Riverside County, and Los Angeles County, respectively. (The Consumer Plaintiffs' declarations are attached hereto as Exhibit A.)

27.     Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### (1) Defendants and the Products at Issue.

28.     Coca-Cola manufactures, markets, and sells beverages, including bottled water, in the United States under several brand names, including Dasani.

29.     BTB manufactures, markets, and sells beverages, including bottled water, in the United States under several brand names, including Arrowhead, Poland Springs, Ozarka, and Deer Park.

30.     Niagara manufactures, markets, and sells beverages, including bottled water, in the United States under several brand names, including Niagara, Costco Kirkland, Save Mart Sunny Select, and Save Mart Market Essentials.

31.     The following brands of bottled water are referred to herein as the "Products": Dasani, Arrowhead, Poland Springs, Ozarka, Deer Park, Niagara, Costco Kirkland, Save Mart Sunny Select, and Save Mart Market Essentials.

32.     Each of the Products has three basic plastic components: the bottle, the bottle cap, and the label that is wrapped around the bottle. The bottles are made of polyethylene terephthalate (PET, #1 plastic). The Products' bottle caps are made of polypropylene (PP, # 5 plastic) or high-density polyethylene (HDPE, #2 plastic). The Products' labels are made from biaxially oriented polypropylene (BOPP) and/or other forms of PP film.

33.     Throughout the class period, Defendants have consistently labeled the Products as "100% RECYCLABLE" as shown in the following images.

34.     Dasani:



35.    Arrowhead:



36.    Poland Springs:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

37.   Ozarka:



38.   Deer Park:




SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

39.     Niagara:



40.     Costco Kirkland:



SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

41.     Save Mart Sunny Select:



42.     Save Mart Market Essentials:



**(2) Reasonable Consumers Understand That 100% Recyclable Means The Entirety of The Product Can Be Recycled By A Substantial Majority of Established Recycling Programs.**

43.     Plaintiffs engaged an independent survey firm to execute a survey of California consumers who reported purchasing bottled water in the last 6 months.

44.     Respondents were first shown the following photo of a package of the Products with the "100 Recyclable" claim:



45.     The photo was displayed for a minimum of 15 seconds, but respondents could look at it for as long as they liked. Respondents were then asked a series of questions.

46.     First, respondents were asked to type the percentage of the water bottles (including the label and cap) they believed were recyclable with a number 0-100.  **73.1%** of respondents responded that they believed 100 percent of the bottle was recyclable.

47.     Respondents were asked, "Based on the packaging, do you believe that the labels on the bottles are recyclable?" **90.4%** of the respondents said yes and 9.6% said no.

48.     Respondents were asked, "Based on the packaging, do you believe that the caps of the bottles are recyclable?" **91.7%** of the respondents said yes and 8.3% said no.

49.     Respondents were asked, "Based on the packaging, do you believe that the entire product (including the bottle, label and cap) will actually be recycled by facilities in the state of California if it is properly disposed of in a recycling bin?" **86.7%** of the respondents said yes and13.3% percent said no.

50.     Respondents were finally showed the following images:

Product A                                      Product B

 

51.     Below the pictures, they were presented with the question, "[b]ased on the packaging above, which of the following do you believe is most likely?"

52.     They were given the following three options, which were presented to each participant in a randomized order:

- "Product A is more capable of being completely recycled."
- "Product B is more capable of being completely recycled."
- "Products A and B are equally capable of being completely recycled."

53.     61.6% of respondents selected that they believed "Product A is more capable of being completely recycled."

**(3) Defendants' Representations that the Products Are "100% Recyclable" Are False.**

54.     Pursuant to California law, recycling is "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace." Cal. Pub. Res. Code § 40180. Thus, "recyclable" products must be comprised of materials that, if discarded into a recycling bin, can be recycled into the form of raw material for new, reused, or reconstituted products by existing recycling programs. A product labeled as "100% Recyclable" must be entirely comprised of materials that can be recycled into raw material by existing recycling programs.

55.     Recycling in California is collected through two streams: (1) municipal recycling programs (aka curbside recycling programs) and (2) recycling centers where consumers can bring cans and bottles to redeem the California Refund Value ("CRV").

56.     Curbside recycling programs account for the overwhelming majority of PET recycling in California. Municipalities enter into agreements with Materials Recovery Facilities ("MRFs"), which sort recyclables and sell the sorted material to reclaimers for further processing.

57.     There are approximately 375 MRFs in the United States (75 of which operate in California). Some MRFs, such as the Berkeley Recycling Center, which operates in Berkeley, CA, are associated with particular cities, other MRFs serve multiple municipalities.

58.     The list of materials that a particular municipal recycling program accepts for recycling is determined by what the MRF is capable of sorting and reselling to reclaimers.

59.     Historically, MRFs in California and throughout the United States were dependent on China for reclamation where it is much cheaper to sort and process recyclable plastic. Indeed, since 1992, China imported about 45% of the world's plastic waste.[4] During that time, the United States imported a massive amount of consumer goods from China. Tens of thousands of cargo containers were brought to the United States filled with merchandise but the ships remained empty on their return journey. Eventually, MRFs started using this excess capacity to cheaply export recyclable waste to China.

60.     This arrangement abruptly ended in 2018 when China implemented a plastic recycling import ban on most plastic waste exported from the United States—China's "National Sword" policy. The National Sword policy has permanently changed how California and the United States process recycling. As a result, MRFs are more reliant on domestic reclaimers to process their plastics goods. MRFs are now much more selective regarding the plastics that they accept.

61.     Since the implementation of the National Sword policy, PP and BOPP plastics, which are the material used to make the Products' bottle caps and film labels, respectively, are widely considered to be the least recyclable plastics. These plastics are collected by MRFs in California for #3-

---

[4] Amy Brooks, *The Chinese import ban and its impact on global plastic waste trade* (Jun. 20, 2018) https://www.science.org/doi/10.1126/sciadv.aat0131.

7 mixed bales that require further processing. However, "the economics [of processing those bales] have proven insurmountable."[5] Thus, mixed plastic #3-7 bales that were "previously exported to China now have negligible to negative value across the country and 'cannot be effectively or efficiently recycled in the US.'"[6] As a result, though PP is frequently collected in California, reclaimers do not process it in significant quantities. It therefore must be landfilled or incinerated, which releases large quantities of greenhouse gases and toxic air emissions.

62.     Indeed, in California, only 2 out of the 75 MRFs in California accept plastic bags. And there are no MRFs in California that accept plastic wrap. This is because plastic film, regardless of whether it is made from BOPP, PP, or LDPE, cannot be sorted and shredded into plastic flake material using the existing infrastructure in California and plastic film recycling is not available to a substantial majority of consumers in California.[7] Indeed, plastic film is considered a contaminant by most MRFs.

63.     The BOPP labels that Defendants use are made of similar materials as plastic bags and plastic film wrap that is unrecyclable and not accepted by MRFs in California. Although MRFs accept PET plastic bottles because they are partially recyclable, the labels and caps are removed or lost during processing and the byproduct is treated refuse.

64.     Municipalities in California offer single stream or dual stream recycling. In single stream recycling programs, Californians mix all recyclables into a single bin, including plastic water bottles. In dual stream, plastics are separated from paper goods. In either case, the recyclable material is hauled to an MRF by a municipal recycling program for further sorting.

65.     A typical MRF in California and nationally uses multiple sorting methods to separate plastics, paper, and aluminum. After plastic is separated from metal and paper, it must be further sorted. Sophisticated MRFs use optical scanners that are capable of distinguishing PET plastics from other types of plastics. During the sorting and hauling process, the caps of the bottles fall off. Either the

---

[5] Greenpeace, *supra*, note 7, at Section 4.

[6] *Id.*

[7] The same is true nationally. Only 3 out of 375 MRFs nationally accept plastic bags and there are none that accept plastic wrap. Plastic film recycling for the Products' labels is not available to a substantial majority of consumers nationwide.

bottles are disposed of by the consumer with the cap and bottle already separated or the cap is secured to the bottle but it pops off when the bottle is compressed in the recycling truck or at other points during the sorting and baling process. A substantial portion of these caps are lost during the sorting process because they fall through disk screens at MRFs and are treated as refuse along with other plastic materials and trash that is too small for sorting. The PET bottles and containers are then baled for sale to a reclaimer that will further process the bottles.

66.     Recycling centers also bale PET bottles in a similar way as MRFs except that consumers typically bring recyclables to recycling centers presorted. Many recycling centers, aware that caps are not recyclable, request that consumers remove the caps and lids. For example, Mountain View Recycling Center states on its website: "[b]e sure to empty bottles and remove caps and lids."[8]

67.     Once bottles are sorted by MRFs and recycling centers, they must be processed by a reclaimer. The largest reclaimer of PET bottles in California (and nationally) is the CarbonLite recycling plant in Riverside, CA (purchased by Evergreen in 2021) ("Riverside Plant"). The Riverside Plant processes over two billion PET bottles per year,[9] which means it has capacity to recycle approximately 24% of all the plastic bottles recycled in California.[10]

68.     At the Riverside Facility, the first step is to break up the PET bottle bales. Large contaminants are removed by hand. Then, the bottles go through a metal detector to remove any aluminum or metal that is mixed in the bales. Next, the bottles go through a pre-wash process. During the pre-wash stage, the labels are removed and disposed of as refuse. The cleaned bottles are sorted

---

[8] Mountain View Recycling Center, https://www.mountainview.gov/depts/pw/recycling/facilities/center/defaul+t.asp (last accessed Dec. 9, 2022).

[9] Heather Caliendo, *New California facility recycles 2 billion plastic bottles a year* (Mar. 16, 2012), https://www.plasticstoday.com/new-california-facility-recycles-2-billion-plastic-bottles-year (last accessed Dec. 9, 2022).

[10] *See* Paul Rogers, *California passes first-in-nation plastics recycling law* (Sept. 25, 2020), https://www.mercurynews.com/2020/09/25/california-passes-first-in-nation-plastics-recycling-law/ (last accessed Dec. 4, 2022) (explaining that approximately 12 billion plastic bottles are sold each year and approximately 70% (8.4 billion of them are recycled)).

further and then shredded into flakes. The"clean flake" material is then sold or further processed into plastic pellets that can be used to make new plastic items.

69.     Due to contamination and processing losses, not all PET and HDPE material that is processed by reclaimers and MRFs is actually converted into "clean flake" for reuse.[11] About a third of the plastic bottle material processed by recycling facilities in California is not converted into "clean flake," and is instead, landfilled or incinerated.[12]

70.     Leon Farhnik, the former CEO of CarbonLite Industries, the former owner and operator of the Riverside Plant, describes the process: "[f]rom the time it starts till it ends, as a resin—as a material—you lose about 30% of it in caps, in labels, in dirt. And we end up with only 70% of what we get in."

71.     Peninsula Plastics Recycling, another major reclaimer in California operates out of Turlock, California. Like the Riverside Facility, Peninsula employs a pre-wash system that removes and disposes labels prior to flaking the plastic. It has an annual output of 60 Million pounds of PET flake per year, which means that is approximately 80% the size of the Riverside Plant.[13] Together the Riverside Plant and Peninsula Plastics have capacity for more than 40% of the PET bottle recycling that occurs in California.

72.     The Riverside and Peninsula facilities are typical of PET reclaimers in California, which all use substantially similar equipment and are unable to recycle 28% of the total PET plastic bottle material that they receive, including labels and caps.

73.     Further, due to the availability of cheap raw materials to make "virgin plastic," there is very little market demand for recycled PP and BOPP plastic. Using virgin plastic to package and make products is cheaper than other materials because virgin plastic is derived from oil and natural gas. Indeed, recognizing the market potential from plastic production, major oil and natural gas companies

---

[11] Jan Dell, *Six Times More Plastic Waste is Burned in U.S. than is Recycled* (April 30, 2020), https://www.plasticpollutioncoalition.org/blog/2019/4/29/six-times-more-plastic-waste-is-burned-in-us-than-is-recycled (last accessed June 10, 2021).

[12] *Id.*

[13] Peninsula Plastics Recycling, https://peninsularecycling.com/about-us/ (last accessed Dec. 9, 2022).

are increasingly integrating their operations to include production of plastic resins and products, which further drives down the price of "virgin plastic." As a result, recycling facilities cannot afford the cost of breaking down and reconstituting recycled PP and BOPP plastic because there are almost no buyers of the resulting plastic, pellets, or scrap materials. Thus, the Products' PP bottle caps and BOPP labels are not "100% Recyclable" because those materials are not processed into reusable material, and are instead, sent to incinerators or landfills.

74.    Thus, the Products are not 100% Recyclable because (1) recycling facilities in California do not recycle Defendants' PP and HDPE bottle caps, (2) recycling facilities in California cannot recycle the BOPP plastic labels on the bottles, and (3), on average, 28% of each bottle sent to recycling facilities in California cannot be processed due primarily to contamination in the waste stream and ends up in landfills or burned. Thus, contrary to the claim that the Products are "***100%*** Recyclable," the entirety of the Products are not comprised of materials that are recyclable and the entirety of the Products are not actually recycled by recycling facilities in California when they are disposed of in a recycling bin.

### (4) Defendants' Marketing of the Products Violates California Public Policy and the Federal Trade Commission Green Guides Which Reject A Definition of Recyclability Based on Theoretical Recyclability.

75.    The State of California has declared that "it is the public policy of the state that environmental marketing claims, whether explicit or implied, should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers about the environmental impact of plastic products." Cal. Pub. Res. Code § 42355.5. The policy is based on the Legislature's finding that "littered plastic products have caused and continue to cause significant environmental harm and have burdened local governments with significant environmental cleanup costs." Cal. Pub. Res. Code § 42355.

76.    Additionally, California Business and Professions Code section 17580.5 makes it "unlawful for any person to make any untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied." Pursuant to that section, the term "environmental marketing claim"

includes any claim contained in the Green Guides. Cal. Bus. & Prof. Code § 17580.5; *see also* 16 C.F.R. § 260.1, *et seq.* As detailed below, Defendants' marketing of the Products as "100% Recyclable" violates several provisions of the Green Guides.

77.     The general rule under the Green Guides is that a product may be labeled as *"recyclable"* if recycling facilities for the Product are available to a substantial majority (defined as 60%) of the consumers or communities where the item is sold. *See* 16 C.F.R. § 260.12(b)(1). A product does not need to be recyclable in its entirety to be labeled as "recyclable." In other words, it is acceptable to label a plastic bottle as "recyclable" if it is less than "100% Recyclable." § 260.12(c). However, Defendants do not represent that the Products are merely *"recyclable,"* they state that the Products are *"100% Recyclable."* This communicates to reasonable consumers that the Products exceed the standard of recyclability in the Green Guides, which is by definition less than 100%, and that Products are recyclable in their entirety. Defendants' use of the "100%" qualifier is deceptive and prohibited by the Green Guides, which requires "[m]arketers [to] clearly and prominently qualify recyclable claims to the extent necessary to avoid deception about the availability of recycling programs and collection sites to consumers." § 260.12(b). Here, the use of the 100% claim is misleading and Defendants have failed to provide an appropriate disclaimer.

78.     The Green Guides further provide that it is "deceptive to misrepresent, directly or by implication, that a product or package is recyclable. A product or package should not be marketed as recyclable unless it can be collected, separated, or otherwise recovered from the waste stream through an established recycling program *for reuse or use in manufacturing or assembling another item*." § 260.12(a) (emphasis provided). "If recycling facilities are available to less than a substantial majority [defined as at least 60%] of consumers or communities where the item is sold, marketers should qualify all recyclable claims." § 260.12(b)(1). Further "[i]f any component significantly limits the ability to recycle the item, any recyclable claim would be deceptive." § 260.12(d). And in promulgating the current recycling definition, the Federal Trade Commission ("FTC") clarified that "[f]or a product to be called 'recyclable,' there must be an established recycling program, municipal or private, through which the product will be *converted into, or used in, another product or package*." *See* 63 Fed. Reg.

84, 24247 (May 1, 1998) (emphasis added). As the FTC has stated, "while a product may be technically recyclable, if a program is not available allowing consumers to recycle the product, there is no real value to consumers." 63 Fed. Reg. 84, 24243 (May 1, 1998). Here, polypropylene recycling is not available to a substantial majority of consumers in California. And there are significant limitations on the recyclability of HDPE bottle caps because of their size that Defendants fail to disclose. Those materials are not converted into another product or package, but are landfilled or incinerated by the recycling programs. Therefore, it is deceptive to represent that the Products are "100%" recyclable.

79.     In promulgating the most recent version of the Green Guides, the FTC stated the following (under the heading "Packages Collected for Public Policy Reasons but Not Recycled"):

> The Commission agrees that unqualified recyclable claims for categories of products that municipal recycling programs collect, but do not actually recycle, may be deceptive. To make a non-deceptive unqualified claim, a marketer should substantiate that a substantial majority of consumers or communities have access to facilities that will actually recycle, not accept and ultimately discard, the product. As part of this analysis, a marketer should not assume that consumers or communities have access to a particular recycling program merely because the program will accept a product.

80.     The California Public Resources Code similarly defines recycling as "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace." Cal. Pub. Res. Code § 40180. Thus under California law, a product is not recyclable if it is not processed into raw material that can be used in manufacturing.

81.     Defendants' marketing of the Products as "100% Recyclable" violates California law because it is false that 100% of the Product—i.e. all components of the Product—can be collected, separated, or otherwise recovered from the waste stream, in a substantial majority of communities where the Products are sold in California, through an established recycling program for reuse or use in manufacturing or assembling another item. Although the Products are accepted for recycling by most curbside programs: (1) recycling facilities in California do not recycle Defendants' PP and HDPE bottle caps, (2) recycling facilities in California cannot recycle the BOPP plastic labels on the bottles, and (3),

on average, 28% of each bottle sent to recycling facilities in California cannot be processed due primarily to contamination in the waste stream and ends up in landfills or burned.

82.     Defendants' marketing of the Products as "100% Recyclable" also violates the Green Guide provisions regarding products that cannot be recycled in their entirety. Section 260.12(c) of the Green Guides provides that "[m]arketers can make unqualified recyclable claims for a product or package if the entire product or package, excluding minor incidental components, is recyclable. For items that are partially made of recyclable components, marketers should clearly and prominently qualify the recyclable claim to avoid deception about which portions are recyclable." Similarly, section 260.3(b) of the Green Guides requires an environmental marketing claim to "specify whether it refers to the product, the product's packaging, a service, or just to a portion of the product, package, or service." 16 C.F.R. § 260.3(b). Defendants' "100% Recyclable" representation violates this standard of the Green Guides because it claims to refer to the bottles, the bottle caps, and the label. The caps and the labels are not an incidental component, and even if they were, as explained above, the fact that they are not recyclable makes the claim "100% Recyclable" false and misleading.

83.     Further, the Green Guides require marketers to support their claim with a reasonable basis before they make the claims. 16 C.F.R. § 260.2 ("Marketers must ensure that all reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis before they make the claims."). "[A] firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act." *See* FTC Policy Statement Regarding Advertising Substantiation, 104 FTC 839 (1984) (cited by 16 C.F.R. § 260.2). Defendants do not possess information sufficient to support their claims that the Products are "100% Recyclable."

### (5) Consumer Demand for "100% Recyclable" Products and Defendants' Use of Coordinated Marketing Campaigns, including the "Every Bottle Back" Initiative, to Defraud the General Public.

84.     In recent years, consumers have become significantly more aware and sensitive to their impact on the environment through the products they purchase and use. As a result, many consumers

demand and are willing to pay more for products that are environmentally superior to similar products, in that these superior products cause less harm to the environment, and reduce consumers' environmental footprint. The term "green" is commonly used to describe these products. Factors important in determining that a product is environmentally superior to a similar product include the adverse impact to the environment caused by the manufacturing, use, and disposal of a product.

85.     In 2018, after the implementation of National Sword, environmental organizations such as the Sierra Club and Greenpeace began applying greater pressure to the plastics industry through public information campaigns. The central message was that the recycling system is broken and that reuse was the only truly sustainable option. For example, a January 19, 2018 press release on the Greenpeace website titled *Greenpeace slams Coca-Cola plastic announcement as 'dodging the main issue'* stated:

> Greenpeace is urging Coca Cola to make firm commitments to cut its plastic production by investing in alternatives to single-use plastic bottles, including committing to expand its use of new delivery methods such as Freestyle dispensers and self-serve water stations with reusable containers.[14]

86.     On July 23, 2019, in response to pressure from the Sierra Club and similar organizations, Coca-Cola started a marketing counter-offensive. It began by announcing its "plan to end their memberships with the Plastics Industry Association" ("PLASTICS"), a well-known plastic industry lobbying group that has fought bans on single-use plastics.[15]

87.     On October 29, 2019—three months after breaking ties with PLASTICS—Coca-Cola, and the American Beverage Association ("ABA") launched the "Every Bottle Back" initiative attempt to convince the Public that their single-use plastic products are different than other recyclable products because they are "***100%*** Recyclable." I.e., recyclable in their entirety by existing recycling programs.

---

[14] Perry Wheeler, *Greenpeace slams Coca-Cola plastic announcement as 'dodging the main issue'*, Greenpeace (Jan. 19, 2018), https://www.greenpeace.org/usa/news/greenpeace-slams-coca-cola-plastic-announcement-as-dodging-the-main-issue/ (last visited Apr. 7, 2021).

[15] Perry Wheeler, *Industry giants Coca-Cola and PepsiCo ditching pro-plastics lobbying association,* Greenpeace (Jul. 23, 2019), https://www.greenpeace.org/usa/news/industry-giants-coca-cola-and-pepsico-ditching-pro-plastics-lobbying-association/#:~:text=Washington%2C%20DC%20%E2%80%93%20As%20pressure%20mounts,advocated%20against%20plastic%20bans%20nationwide (last visited Apr. 7, 2021).

88.   The "Every Bottle Back" website includes the following representations:

**OUR NEW INITIATIVE:**
**TOGETHER, WE'RE COMMITTED TO GETTING** *EVERY BOTTLE BACK*

Our plastic bottles are made to be remade. We are carefully designing them to be 100% recyclable – even the caps. Our goal is for every bottle to become a new bottle, and not end up in oceans, rivers, beaches and landfills. And that means we are using less new plastic.

**We are making**
**100%**
**recyclable plastic bottles.**
**And we want them back.**

https://www.innovationnaturally.org/recycling/

# MORE EFFICIENT RECYCLING MEANS LESS NEW PLASTIC IN OUR ENVIRONMENT.

We're making 100% recyclable plastic bottles, and that's a critical first step. But it only helps the environment if we get them back so they don't end up in oceans, rivers and beaches. So we're working hard to support strong recovery and recycling systems across the country.

https://www.innovationnaturally.org/plastic/

89.   The misrepresentation that plastic bottles are "100% Recyclable" is repeated throughout the EBB website with language such as "[w]e've made our plastic bottles to be 100% recyclable, including the caps."

90.   The most important part of the "Every Bottle Back" initiative is the coordinated use of the "100% Recyclable" claim. As the website explains, the major feature of the campaign is a "public

awareness campaign to help consumers understand the value of 100% recyclable bottles" and the use of "a new voluntary on-pack message to promote the recyclability of our plastic bottles and caps." The ABA website further elaborates that the beverage makers are "[w]ork[ing] together to leverage our packaging to remind consumers that our bottles are 100% recyclable and can be remade into new bottles. Beverage companies will begin introducing voluntary messaging on packages in late 2020."

91.     To lend credibility to the initiative, the ABA and its partners provided over $100 million in funding to The Recycling Partnership and Closed Loop Partners. The website also references support from the World Wildlife Fund's corporation activation hub, Resource: Plastic.

92.     All Defendants have adopted the voluntary "100% Recyclable" language as a part of a coordinated scheme to defraud the public and have benefited from the "Every Bottle Back" public awareness campaign designed to do the same.

93.     Defendants market the Products as "100% Recyclable" to capitalize on consumer demand for "green" products. In particular, Defendants intend for reasonable consumers to believe, and reasonable consumers do believe, that the Products will be recycled in their entirety if the consumer disposes of the empty bottles in a recycling bin. Further, Defendants intend for consumers to believe, and reasonable consumers do believe, that because the Products are "100% Recyclable," the bottles are specially designed to be environmentally superior to competitors' products that do not contain the same representation.

94.     Defendants' coordinated and illegal marketing campaign has been extremely successful. Defendants collectively sell a large percentage of the bottled water sold in the United States. The Products are sold in grocery stores, gas stations, and big box stores throughout California and the country. Because of the big potential for sales, Defendants have no incentive to stop claiming that the Products are "100% Recyclable" or change their disclaimers to discourage sales.

95.     Because consumers are led to believe the bottles are "100% Recyclable" and are superior to less environmentally-friendly plastic water bottles, and therefore purchase them because they are a "green" product, Defendants are able to charge a premium for the Products. If consumers knew that the Products were not "100% Recyclable," the product would not command a premium price

based on that representation, fewer consumers would purchase them, and consumers would not pay the premium attributable to that representation.

### (6) BTB and Coca-Cola's Misrepresentations Frustrate the Sierra Club's Mission and Force It to Divert Resources.

96.     The Sierra Club's mission is to "[t]o explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives."

97.     The Sierra Club achieves its mission by mobilizing a community of 3.8 million members, supporters, and grassroots volunteers to bring attention to practices by governments and major companies that threaten the planet. The Sierra Club rallies its volunteers through the use of petitions, protests, and other events. Additionally, the Sierra Club uses its network to pressure and advocate for change through legislation and strategic lawsuits. The Sierra Club's efforts have secured protection for hundreds of parks and monuments and led to the passage of landmark legislation such as the Clean Air Act and the Endangered Species Act. The Sierra Club has tremendous credibility and influence with the public as the oldest conservation organization in the country.

98.     Another integral component of the Sierra Club's operations in furtherance of its mission is to educate the public regarding environmental issues. It achieves this through hosting movie screenings, events, and publishing newsletters and magazines such as *Sierra*, the national magazine of the Sierra Club. The Sierra Club believes that if the public is properly informed, it will act responsibly to protect the planet.

99.     The Sierra Club's mission is directly frustrated by BTB and Coca-Cola's manufacture, sale, and false marketing of single-use plastic bottles as "100% Recyclable" for at least two reasons. First, the claim increases the sale of the Products because consumers falsely believe the Products are "green" and that are misled regarding the true environmental impact of the Products. However, the entirety of the each bottle cannot be recycled by existing recycling programs and the unrecyclable portions of the Products end up in the environment, in landfills, and incinerated. This negatively

impacts humans, animals and ecosystems and is directly antagonistic to the Sierra Club's express mission to "protect the planet." Second, the claim that the single-use bottles are "100% Recyclable" undermines the Sierra Club's mission to "educate and enlist humanity to protect" the natural environment because it misinforms consumers that the Products can be recycled in their entirety if they are disposed of in a recycling bin. If the public is not properly educated and informed about the consequences of their actions—that plastic bottles are not "***100%*** Recyclable" and that a substantial portion of each bottle cannot be recycled, and instead, ends up in rivers, waterways and landfills—they cannot make environmentally responsible choices.

100.     The Sierra Club has expended considerable resources to combat BTB and Coca-Cola's misrepresentations. In particular, during the past two years, the Sierra Club has diverted substantial volunteer and staff hours to support legislation in California that prohibits false recycling claims and supports the use of reusable bottles, including SB 343 and AB 962.

101.     SB 343, the Truth in Labeling for Recyclable Materials bill, addresses the mislabeling of products as recyclable. The measure expands on the "Truth in Environmental Advertising" law that prohibits the use of the word "recyclable" on unrecyclable products or any other suggestion that a material is recyclable unless the material is actually recyclable in most California communities and is routinely sold to make new products. The bill declares that it is the "public policy of the state that claims related to the recyclability of a plastic product be truthful." Cal. Pub. Res. Code, § 42355.5 (proposed amendment).[16] It further requires that companies keep evidence supporting the validity of any "use of a chasing arrows symbol" or claim that otherwise "direct[s] a consumer to recycle a consumer good" including documentation regarding "[t]he reasons the person believes the representation to be true;" "[a]ny significant adverse environmental impacts directly associated with the production, distribution, use, and disposal of the consumer good;" "[a]ny measures that are taken by the person to reduce the environmental impacts directly associated with the production, distribution, and disposal of the consumer good;" "[v]iolation of any federal, state, or local permits directly associated

---

[16] Proposed Text of SB 343 available at:
https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220SB343 (last visited May 26, 2021).

with the production or distribution of the consumer good;" "[w]hether, if applicable the consumer good conforms with the uniform standards contained in the Federal Trade Commission Guidelines for Environmental Marketing Claims for the use of the term 'recycled,' 'recyclable,' 'biodegradable,' 'photodegradable,' or 'ozone friendly,'" and "[i]f the person uses the term 'recyclable,' uses a chasing arrows symbol, or otherwise directs consumers to recycle the consumer good, whether the consumer good meets all of the criteria for statewide recyclability pursuant to ection 42355.51 of the Public Resources Code." Cal. Bus. & Prof. Code § 17580 (proposed amendment). The bill further empowers the state of California to create a list of the "types and forms of plastic products and packaging for which a claim of recyclability, including the use of a chasing arrows symbol, may be made." Cal. Pub. Res. Code, § 42355.51(d) (proposed amendment).

102.    SB 343 directly combats BTB and Coca-Cola's "100% Recyclable" claim because it places greater restrictions on the types and forms of plastic products and packaging for which a claim of recyclability can be made unless it is truly recyclable. Although California has already made it clear that deceptive environmental claims are against public policy, this bill specifically targets false recyclability claims, such as BTB and Coca-Cola's "100% Recyclable" claim, by expressly stating that it is against the public policy of the state of California to make false "claims related to the recyclability of a plastic product." Cal. Pub. Res. Code § 42355.5 (proposed amendment). Additionally, it requires BTB and Coca-Cola to, *inter alia*, keep detailed records relating to its recyclability claims.

103.    In or around March 2021, the Sierra Club internally designated the SB 343 as high-priority because of its importance in achieving the Sierra Club's mission and to counteract false recycling claims such as "100% Recyclable" that appear on the Products. The Sierra Club has since drafted and submitted a letter of formal support of the legislation and advocated in favor of the bill at legislative hearings.

104.    AB 962, the California Beverage Container Recycling and Litter Reduction Act, would provide for increased bottle deposits and a system for processing and washing reusable bottles. The purpose of this bill is to reduce waste generated from single-use bottles such as those made by BTB and

Coca-Cola by creating an alternate system of reusable bottles.[17] The Sierra Club's response to BTB and Coca-Cola's deceptive practices has been, in part, to educate the public that reusable containers are the only truly sustainable way to consume water. This law provides a convenient and viable system for reusing bottles.

105.     AB 962 directly combats BTB and Coca-Cola's false "100% Recyclable" claim by offering an alternative to single-use bottles. AB 962 creates a new system so that manufacturers of water bottles can offer truly sustainable and convenient bottled water to the public and addresses the root cause of the problem, i.e., that plastic water bottles cannot be fully recycled into new materials.

106.     In or around March 2021, the Sierra Club internally designated the AB 962 as high-priority because of its importance in achieving the Sierra Club's mission and to counteract false recycling claims such as "100% Recyclable" that appear on the Products. The Sierra Club has since drafted and submitted a letter of formal support of the legislation and advocated in favor of the bill at legislative hearings.

107.     In addition to the Sierra Club's lobbying efforts, on June 1, 2021, the Sierra Club California Zero Waste Committee tweeted the following on its twitter account:

> Is this @ArrowheadWater bottle including its cap and label really 100% recyclable? Would they be recycled?
> @SierraClubCA supports SB343 Truth in Labeling for Recyclable Material
> @BenAllenCA @Laurafriedman43 @LorenaAD80

The tweet included a picture of the Arrowhead label with the "100% Recyclable" claim. This tweet was intended to inform the public regarding BTB's false claims.

108.     On June 2, 2021, the official Twitter account of BTB's Arrowhead brand (@ArrowheadWater) responded, "While not every recycling center has the same capabilities, our cap and label are 100% recyclable. That's why we ask our consumers to replace the cap and leave the label on when dropping our bottles in the recycling bin!"

109.     On June 6, 2021, the Sierra Club Angeles Chapter, in direct response to BTB and Coca-

---

[17] Proposed Text of AB 962 available at:
https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202120220AB962 (last visited May 26, 2021).

Cola's claims, drafted and published an article on its website explaining to the public and its members the importance of passing SB 343 due to false claims, such as "100% Recyclable," that appear on the Products.[18] The article specifically used photos of BTB and Coca-Cola's Products as examples of the false advertising that SB 343 is designed to combat.

110.    On June 15, 2021, the Sierra Club further disseminated the June 6, 2021 article to over five hundred club members and activists using an email alert.

111.    These efforts were not "business as usual" for Sierra Club, as Sierra Club would not have, and could not have, analyzed and specifically responded to BTB and Coca-Cola's misleading label claims if they had not made those claims in the first place. Instead, Sierra Club would have used those resources to continue to educate consumers and citizens on what they can do to protect our environment, rather than using those resources merely to fight back against the misperceptions and confusion caused by BTB and Coca-Cola's labels.

112.    The Sierra Club will continue to advocate on behalf of the environment and to inform consumers about greenwashing and BTB and Coca-Cola's false claims so that consumers can make informed purchasing decisions. If BTB and Coca-Cola's misconduct described herein is not enjoined, the Sierra Club's mission will continued to be frustrated by BTB and Coca-Cola's conduct and it will be forced to continue to divert resources to inform the public about the false claims on the Product labels.

## THE CONSUMER PLAINTIFFS' EXPERIENCES

113.    Plaintiff Muto purchased three 24-packs of Dasani water bottles from Costco in La Quinta, CA on or around April 15, 2021. He saw the claim "100% Recyclable" on the Products and he purchased them, in part, because he believed that the entirety of the bottles, including the labels and caps, could and would be recycled if he disposed of them in a recycling bin because the Products were comprised entirely of materials that can be recycled by existing recycling programs in California. Recycling is important to Plaintiff Muto because he has children and he wishes to protect the

---

[18] Simone Kufhal, *Truth in Recycling*, Sierra Club Angeles Chapter Website (June 7, 2021), https://angeles.sierraclub.org/news_conservation/blog/2021/06/truth_in_recycling (last accessed June 10, 2021).

environment for future generations. He did in fact dispose of the bottles in a recycling bin. However, for the reasons discussed *supra*, the bottles were not and could not be recycled in their entirety. Plaintiff Muto did not receive that which he was promised. Had he known that the Products were not "100% Recyclable," he would not have purchased them, or at a minimum, he would have paid less for them.

114.    Plaintiff Salgado purchased a 24-pack of 16.9-ounce Niagara water bottles from Numero Uno Market in Los Angeles, CA on or around April 15, 2020. Plaintiff Salgado also purchased an 8-pack of 12-ounce Dasani water bottles from the Target store near her home on or around April 20, 2021. Plaintiff Salgado saw the claim "100% Recyclable" on the Products and purchased them, in part, because she believed that the entirety of the bottles, including the labels and caps, could and would be recycled if she disposed of them in a recycling bin because the Products were comprised entirely of materials that can be recycled by existing recycling programs in California. Recycling is important to Plaintiff Salgado and she prefers to make purchases that reduce her environmental footprint whenever possible. She did in fact dispose of the bottles in a recycling bin. However, for the reasons discussed *supra*, the bottles were not and could not be recycled in their entirety. Plaintiff Salgado did not receive that which she was promised. Had she known that the Products were not "100% Recyclable," she would not have purchased them, or at a minimum, she would have paid less for them.

115.    Plaintiff Swartz purchased a bottle of Arrowhead water from a gas station in Merced County, CA on or around November 2020. Plaintiff Swartz saw the claim "100% Recyclable" on the Product and purchased it, in part, because he believed that the claim meant that the entirety of the bottle, including the label and cap, could and would be recycled if he disposed of it in a recycling bin because the Products were comprised entirely of materials that can be recycled by existing recycling programs in California. Recycling is important to Plaintiff Swartz and he tries to make purchases that reduce his environmental footprint whenever possible. He did in fact dispose of the bottle in a recycling bin. However, for the reasons discussed *supra*, the bottle was not and could not be recycled in its entirety. Plaintiff Swartz did not receive that which he was promised. Had he known that the Product was not "100% Recyclable," he would not have purchased it, or at a minimum, he would have paid less for it.

116.     The Consumer Plaintiffs cannot determine the composition of each of the parts of the plastic bottles they purchase at the point of sale, and rely on the label that states that the Products are "100% Recyclable" when analyzing the Products' recyclability. Because the Consumer Plaintiffs cannot be certain of the composition of bottles going forward, and cannot determine whether the Products can ultimately be recycled, the Consumer Plaintiffs will be unable to rely on Defendants' labels when shopping for bottled water in the future absent an injunction that prohibits Defendants from falsely labeling their products as "100% Recyclable."

117.     The Consumer Plaintiffs continue to desire to purchase water in bottles that are "100% Recyclable" from Defendants because it is their belief that a truly "100% Recyclable" single-use water bottle would be convenient and friendlier to the environment than a water bottle that is not completely recyclable. The Consumer Plaintiffs are unable to determine if the Products are "100% Recyclable" prior to their purchase. The Consumer Plaintiffs understand that the design and composition of the Products may change over time, that municipal recycling technology may change in the future, and that Defendants could potentially reengineer the Products to make them truly "100% Recyclable." But as long as Defendants may use the phrase "100% Recyclable" to describe plastic water bottles that are not "100% Recyclable," then when presented with Defendants' packaging, the Consumer Plaintiffs continue to have no way of determining whether the representation "100% Recyclable" is in fact true. Thus, the Consumer Plaintiffs are likely to be repeatedly presented with false or misleading information when shopping and they will be unable to make informed decisions about whether to purchase Defendants' Products and will be unable to evaluate the different prices between Defendants' bottled water and their competitors' bottled water. The Consumer Plaintiffs are further likely to be repeatedly misled by Defendants' conduct, unless and until Defendants are compelled to ensure that their bottled water marketed as "100% Recyclable" is in fact 100% recyclable.

## THE CONSUMER PLAINTIFFS' CLASS ALLEGATIONS

118.     The Consumer Plaintiffs bring this action against Defendants on behalf of themselves and all others similarly situated, as a class action pursuant to section 382 of the California Code of Civil Procedure and section 1781 of the California Civil Code. The Consumer Plaintiffs seek to represent two

Classes of similarly situated persons, defined as follows:

> California Class: All persons who, between June 16, 2017 and the present, purchased the Products in California.

> Niagara Class: All persons who, between June 16, 2017 and the present, purchased in the United States Products manufactured by Niagara.

119.   The following persons and entities are excluded from the Classes: Defendants and their officers, directors, employees, subsidiaries, and affiliates; and all judges assigned to this case and any members of their immediate families.

120.   This action has been brought and may properly be maintained as a class action against Defendants pursuant to the provisions of California Code of Civil Procedure section 382 because there is a well-defined community of interest in the litigation and the proposed Classes are easily ascertainable.

121.   Numerosity: The Consumer Plaintiffs do not know the exact size of the Classes, but it is estimated that each of them is composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

122.   Common Questions Predominate: This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led Defendants' customers to believe that the Products are "100% Recyclable." The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. Among the questions of law and fact common to the Classes are:

    a)   Whether Defendants' Products are "100% Recyclable;"

    b)   Whether Defendants unfairly, unlawfully and/or deceptively represented that the Products are "100% Recyclable" and/or failed to inform class members that the Products are not "100% Recyclable;"

    c)   Whether Defendants' advertising and marketing of the Products sold to class

members was likely to deceive class members or was unfair;

d) Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

e) The amount of the premium lost by class members as a result of such wrongdoing;

f) Whether class members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

g) Whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

123.    Typicality: The Consumer Plaintiffs' claims are typical of the Classes because each of them purchased the Products on one or more occasions during the last four years, in reliance on Defendants' misrepresentations and omissions that the Products are "100% Recyclable." Thus, the Consumer Plaintiffs and class members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each class member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

124.    Adequacy: The Consumer Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. The Consumer Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of class members. The Consumer Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and the interests of the Classes. By prevailing on their own claim, the Consumer Plaintiffs will establish Defendants' liability to all class members. The Consumer Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and the Consumer Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

125.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

126.     The Consumer Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

127.     Plaintiffs do not plead, and hereby disclaim, any causes of action under any regulations promulgated by the FTC. Plaintiffs rely on these regulations only to the extent such regulations have been separately enacted as state law or regulations or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## FIRST CAUSE OF ACTION

**Violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.***

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants)**

128.     The Consumer Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

129.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, *et seq*. ("CLRA").

130.     Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the

sale or lease of goods or services to consumers.

131.    The Consumer Plaintiffs and other California Class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

132.    The Products that the Consumer Plaintiffs (and others similarly situated class members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a).

133.    By engaging in the actions, representations and conduct set forth in this Complaint, Defendants have violated, and continue to violate, § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(5), Defendants' acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendants' acts and practices constitute improper representations that the goods they sell are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendants have disparaged the goods, services, or business of another by false or misleading representation of fact. In violation of California Civil Code §1770(a)(9), Defendants have advertised goods or services with intent not to sell them as advertised. Specifically, in violation of sections 1770 (a)(2), (a)(5), (a)(7) and (a)(9), Defendants' acts and practices led customers to falsely believe that their Products are "100% Recyclable." In violation of section 1770(a)(8), Defendants falsely or deceptively market and advertise that, unlike products not specifically denominated as "100% Recyclable," the Products are "100% Recyclable," when in fact, they are not "100% Recyclable."

134.    The Consumer Plaintiffs request that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendants are not restrained from engaging in these types of practices in the future, the Consumer Plaintiffs and the other members of the California Class will continue to suffer harm.

135.    **CLRA § 1782 NOTICE.** On or around September 21, 2021, the Consumer Plaintiffs provided Defendants with notice and demand that within thirty (30) days from that date, Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices

complained of herein. Defendants failed to take any of the requested actions within thirty days. The Consumer Plaintiffs seek, pursuant to California Civil Code § 1780(a), on behalf of themselves and those similarly situated members of the California Class, actual damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices. With regard to the amount of damages and restitution, the Consumer Plaintiffs seek to recover for themselves and the California Class a full refund of the price paid for the Products, or in the alternative, the price premium paid for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis.

136.    The Consumer Plaintiffs also request that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## SECOND CAUSE OF ACTION

**False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL")**

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on Behalf of the Sierra Club against Coca-Cola and BTB)**

137.    Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

138.    Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the initial filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

139.    Defendants made representations and statements (by omission and commission) that led reasonable consumers to believe that they were purchasing products that were "100% Recyclable." Defendants deceptively failed to inform the Consumer Plaintiffs, those similarly situated, and the general public, that the Products are not "100% Recyclable."

140.    The Consumer Plaintiffs, those similarly situated, and the general public relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had the Consumer Plaintiffs,

those similarly situated, and the general public been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing the Products or paying less for them.

141.    Defendants' acts and omissions are likely to deceive reasonable consumers and the general public.

142.    Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

143.    The aforementioned practices, which Defendants have used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

144.    As a direct and proximate result of such actions, the Consumer Plaintiffs and the California Class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, the Consumer Plaintiffs and the California Class members paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, the Consumer Plaintiffs and the California Class members will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

145.    Additionally, as a direct and proximate result of BTB and Coca-Cola's actions, Plaintiff Sierra Club has suffered and continues to suffer injury in fact and has lost money and/or property as a result of such false, deceptive and misleading advertising in an amount in excess of the jurisdictional minimum of this Court. Specifically, the Sierra Club has diverted significant resources to combat BTB and Coca-Cola's misleading and false recycling claims.

146.    The Consumer Plaintiffs seek equitable relief, including restitution, with respect to their

FAL claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), the Consumer Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. The Consumer Plaintiffs and the California Class members may be unable to obtain monetary, declaratory and/or injunctive relief directly under their other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because the Consumer Plaintiffs may not be able to establish each class member's individualized understanding of Defendants' misleading representations, but the FAL does not require individualized proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC,* 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, the Consumer Plaintiffs and the California Class members may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if the Consumer Plaintiffs are unable to demonstrate the requisite mens rea (intent, reckless, and/or negligence), because the FAL imposes no such mens rea requirement and liability exists even if Defendants acted in good faith.

147.   The Consumer Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising with respect to all Defendants.

148.   Plaintiff Sierra Club seeks a declaration that the above-described practices constitute false, misleading and deceptive advertising with respect to BTB and Coca-Cola.

149.   The Consumer Plaintiffs seek, on behalf of themselves and the California Class members, an injunction against all Defendants prohibiting the sale of the Products within a reasonable time after entry of judgment, unless the Products' packaging and marketing is modified to remove the misrepresentation "100% Recyclable" and/or to disclose the omitted facts about their true recyclability. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that

Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. The Consumer Plaintiffs and the California Class members have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

150.    Plaintiff Sierra Club seeks an injunction against Coca-Cola and BTB prohibiting the sale of the Products within a reasonable time after entry of judgment, unless the Products' packaging and marketing is modified to remove the misrepresentation "100% Recyclable" and/or to disclose the omitted facts about their true recyclability. Plaintiff Sierra Club has no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Coca-Cola and BTB's deceptive advertising. Such misconduct by BTB and Coca-Cola, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to Plaintiff Sierra Club because the misconduct will continue to frustrate its purposes and the Sierra Club will be forced to continue to divert resources to combat BTB and Coca-Cola's false claims. This expectation of future violations will require Plaintiff Sierra Club to repeatedly and continuously seek legal redress in order to recover monies lost as the result of BTB and Coca-Cola's actions. Plaintiff Sierra Club has no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## THIRD CAUSE OF ACTION

### Fraud, Deceit and/or Misrepresentation

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on Behalf of Plaintiff Salgado and the Niagara Class against Niagara)**

151.    The Consumer Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

152.    For the last three years, Defendants have fraudulently and deceptively led the Consumer Plaintiffs and members of the Classes to believe that the Products are "100% Recyclable." Defendants

also failed to inform the Consumer Plaintiffs and members of the Classes that the Products are not "100% Recyclable," that existing recycling infrastructure cannot and does not recycle the bottle caps and plastic film labels, that the bottle caps and plastic film labels must be landfilled or incinerated, and that approximately 30% of plastic that is recycled is lost due to contamination during the recycling process. Thus, Defendants' claim that the Products are "100% Recyclable" is false.

153. Defendants knew that the "100% Recyclable" representation on the Products was false when they made it or they made the representation recklessly without regard for its truth because Defendants engineered and manufactured the Products and reasonably should have investigated whether the Products were "100% Recyclable" before marketing them as such.

154. These misrepresentations and omissions were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by the Consumer Plaintiffs and members of the Classes as to whether to purchase the Products.

155. Defendants made identical misrepresentations and omissions to members of the Classes regarding the Products.

156. The Consumer Plaintiffs and those similarly situated reasonably relied to their detriment on Defendants' fraudulent misrepresentations and omissions. Had the Consumer Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

157. Defendants had a duty to inform the Consumer Plaintiffs and members of the Classes at the time of their purchases that the Products were not "100% Recyclable," that existing recycling infrastructure cannot and does not recycle the bottle caps and plastic film labels, that the bottle caps and plastic film labels must be disposed or incinerated, and that approximately 30% of PET plastic recycled is lost due to contamination during the recycling process. Defendants failed to provide this information to class members. Class members relied to their detriment on Defendants' omissions. These omissions were material to the decisions of the class members to purchase the Products. In making these omissions, Defendants breached their duty to class members. Defendants also gained financially from, and as a result of, their breach.

158.     By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce the Consumer Plaintiffs, and those similarly situated, to alter their position to their detriment. Specifically, Defendants fraudulently and deceptively induced the Consumer Plaintiffs, and those similarly situated, to, without limitation, pay a premium to purchase the Products.

159.     As a direct and proximate result of Defendants' misrepresentations and omissions, the Consumer Plaintiffs, and those similarly situated, have suffered damages. In particular, the Consumer Plaintiffs seek to recover on behalf of themselves and those similarly situated the price premium paid for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis.

160.     Defendants' conduct as described herein was  willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to the Consumer Plaintiffs and those similarly situated.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on Behalf of Plaintiff Salgado and the Niagara Class against Niagara)**

161.     The Consumer Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

162.     For the last three years, Defendants provided false and misleading information regarding the Products, representing that they were "100% Recyclable."

163.     These representations were material at the time they were made. They concerned material facts that were essential to the analysis undertaken by the Consumer Plaintiffs and members of the Classes as to whether to purchase the Products.

164.     Defendants made identical misrepresentations and omissions to members of the Classes regarding the Products.

165.     Defendants should have known their representations to be false and had no reasonable

grounds for believing them to be true when they were made.

166. By and through such negligent misrepresentations, Defendants intended to induce the Consumer Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendants negligently induced the Consumer Plaintiffs, and those similarly situated, without limitation, to purchase the Products.

167. The Consumer Plaintiffs, and those similarly situated, relied to their detriment on Defendants' negligent misrepresentations. Had the Consumer Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, not purchasing (or paying less for) the Products.

168. The Consumer Plaintiffs and those similarly situated have suffered damages. In particular, the Consumer Plaintiffs seek to recover on behalf of themselves and those similarly situated the price premium paid for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis.

### **FIFTH CAUSE OF ACTION**

**Unfair, Unlawful and Deceptive Trade Practices,**

**Business and Professions Code § 17200, *et seq.***

**(On Behalf of the Consumer Plaintiffs and the California Class against All Defendants and on Behalf of the Sierra Club against Coca-Cola and BTB)**

169. Plaintiffs reallege and incorporate by reference the paragraphs of this Complaint as if set forth herein.

170. Within four (4) years preceding the initial filing of the Class Action Complaint, and at all times mentioned herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, deceptive and unlawful business practices outlined in this Complaint.

171. In particular, Defendants have engaged, and continue to engage, in deceptive practices,

in violation of the Unfair Competition Law, California Business & Professions Code § 17200, *et seq.* (the "UCL"), by, without limitation:

    a.    deceptively representing that the Products are "100% Recyclable;" and

    b.    failing to disclose that the Products are not "100% Recyclable."

172.    Defendants' claims that the Products are 100% recyclable are material, untrue, and misleading. These recyclable claims are prominent on all of the Products' marketing, advertising, and labeling materials, even though Defendants are aware that the claims are false and misleading. Defendants' claims are thus likely to deceive reasonable consumers.

173.    Defendants have engaged, and continue to engage, in unfair practices, in violation of the UCL, by, without limitation:

    a.    deceptively representing that the Products are "100% Recyclable;"

    b.    failing to disclose that the Products are not "100% Recyclable;"

    c.    contravening and undermining state policies expressed in Cal. Pub. Res. Code § 42355 ("It is the intent of the Legislature to ensure that environmental marketing claims . . . do not lead to an increase in environmental harm associated with plastic litter") and § 42355.5 (it is "the public policy of [California] that environmental marketing claims, whether explicit or implied, should be substantiated by competent and reliable evidence to prevent deceiving or misleading consumers about the environmental impact of plastic products"); and

    d.    contravening and undermining state and local policies in favor of recycling, recycling programs, and reducing the amount of plastic in landfills and the amount of pollution from plastic in the environment.

174.    Additionally, Defendants have engaged, and continue to engage, in unlawful practices, in violation of the UCL, by, without limitation:

    a.    violating the Federal Trade Commission Green Guides regulations, including, without limitation, 16 C.F.R. §§ 260.3(b), 260.3(c), 260.12(b), 260.12(c), 260.12(d), 260.16(c), 260.1, and 260.2, as described herein;

b.   violating the Environmental Marketing Claims Act, including, without limitation, Cal. Bus. & Prof. Code §§ 17580(a) (Defendants have not maintained in written form in their records information and documentation supporting the validity of their representation) and 17580.5(a) (Defendants' representations and omissions complained of herein constitute untruthful, deceptive, or misleading environmental marketing claims) as described herein (collectively, "Greenwashing");

c.   violating Cal. Pub. Res. Code §§ 42355 and 42355.5;

d.   violating the CLRA as described herein; and

e.   violating the FAL as described herein.

175.   The Consumer Plaintiffs and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices. Had the Consumer Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by not purchasing (or paying less for) the Products.

176.   Defendants' acts and omissions are likely to deceive reasonable consumers and the general public.

177.   Defendants engaged in these unfair practices to increase their profits. Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

178.   The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the California Class members and the general public.

179.   As a direct and proximate result of Defendants' actions, the Consumer Plaintiffs, and other members of the California Class, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, the Consumer Plaintiffs and those similarly situated paid a price

premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendants' misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, the Consumer Plaintiffs and those similarly situated will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

180.    Additionally, as a direct and proximate result of BTB and Coca-Cola's actions, Plaintiff Sierra Club has suffered and continues to suffer injury in fact and has lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Specifically, Sierra Club has diverted significant resources to combat BTB and Coca-Cola's misleading and false recycling claims.

181.    The Consumer Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendants as result of Defendants' conduct. The Consumer Plaintiffs and the California Class members lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct. The Consumer Plaintiffs and the California Class similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the FTC Green Guides, Environmental Claims Marketing Act, and California Public Resources Code do not provide a direct cause of action, so the Consumer Plaintiffs and the California Class must allege those violations as predicate acts under the UCL to obtain relief.

182.    The Consumer Plaintiffs also seek equitable relief, including restitution, with respect to their UCL unlawfulness claims for violations of the CLRA, FAL and their UCL deceptiveness claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), the Consumer Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action in the event that such causes of action do not succeed. The Consumer Plaintiffs and the California Class may be unable to obtain monetary, declaratory and/or injunctive

relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because the Consumer Plaintiffs may not be able to establish each class member's individualized understanding of Defendants' misleading representations of this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster,* 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, the Consumer Plaintiffs and the California Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if the Consumer Plaintiffs are unable to demonstrate the requisite mens rea (intent, reckless, and/or negligence), because the UCL imposes no such mens rea requirement and liability exists even if Defendants acted in good faith.

183.    The Consumer Plaintiffs seek on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent and/or unlawful with respect to all Defendants.

184.    Plaintiff Sierra Club seeks a declaration that the above-described trade practices are fraudulent and/or unlawful with respect to BTB and Coca-Cola.

185.    The Consumer Plaintiffs seek on behalf of themselves and those similarly situated, an injunction against all Defendants prohibiting the sale of the Products within a reasonable time after entry of judgment, unless the Products' packaging and marketing is modified to remove the misrepresentation "100% Recyclable" and/or to disclose the omitted facts about their true recyclability. The Consumer Plaintiffs and the California Class members have no adequate remedy at law for the injuries currently being suffered as an award of monetary damages would not prohibit Defendants' unlawful acts. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1  repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which

2  they were not entitled. The Consumer Plaintiffs and the California Class members have no other

3  adequate remedy at law to ensure future compliance with the California Business and Professions Code

4  alleged to have been violated herein.

5      186.    Plaintiff Sierra Club seeks an injunction against Coca-Cola and BTB prohibiting the sale

6  of the Products within a reasonable time after entry of judgment, unless the Products' packaging and

7  marketing is modified to remove the misrepresentation "100% Recyclable" and/or to disclose the

8  omitted facts about the Products' true recyclability. Plaintiff Sierra Club has no adequate remedy at law

9  for the injuries currently being suffered as an award of monetary damages would not prohibit Coca-

10  Cola and BTB's unlawful acts. Such misconduct by BTB and Coca-Cola, unless and until enjoined and

11  restrained by order of this Court, will continue to cause injury in fact to Sierra Club because it will be

12  forced to continue to divert resources to combat BTB and Coca-Cola's false claims. This expectation of

13  future violations will require Plaintiff Sierra Club to repeatedly and continuously seek legal redress in

14  order to recover monies lost as the result of BTB and Coca-Cola's action. Plaintiff Sierra Club has no

15  other adequate remedy at law to ensure future compliance with the California Business and Professions

16  Code alleged to have been violated herein.

17                          **PRAYER FOR RELIEF**

18      WHEREFORE, the Consumer Plaintiffs, on behalf of themselves and those similarly situated,

19  respectfully request that the Court enter judgment against all Defendants as follows:

20      A.    Certification of the proposed Classes, including appointment of Plaintiffs' counsel as

21            class counsel;

22      B.    An order temporarily and permanently enjoining Defendants from continuing the

23            unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

24      C.    An award of compensatory damages in an amount to be determined at trial;

25      D.    An award of statutory damages in an amount to be determined at trial;

26      E.    An award of punitive damages in an amount to be determined at trial;

27      F.    An award of treble damages;

28

G.     An award of restitution in an amount to be determined at trial;

H.     An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

H.     For reasonable attorney's fees and the costs of suit incurred; and

I.     For such further relief as this Court may deem just and proper.

WHEREFORE, Plaintiff Sierra Club respectfully requests that the Court enter judgment against BTB and Coca-Cola as follows:

A.     An order temporarily and permanently enjoining BTB and Coca-Cola from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

B.     For reasonable attorney's fees and the costs of suit incurred; and

C.     For such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: August 17, 2023      **GUTRIDE SAFIER LLP**

*/s/ Rajiv V. Thairani*
Marie A. McCrary, Esq.
Seth A. Safier, Esq.
Rajiv V. Thairani, Esq.
100 Pine Street, Suite 1250
San Francisco, California 94111

Attorneys for Plaintiffs

# Exhibit A

## **EXHIBIT A**

I, Marcelo Muto, declare:

1.       I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.       I submit this Declaration pursuant to California Code of Civil Procedure section 2015.5 and California Civil Code section 1780(d).

3.       I purchased 3 24-packs of Dasani water bottles in Riverside County, California. My most recent date of purchase was approximately on or around April 15, 2021.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 28th day of April 2021, in Indio, California.



Marcelo Muto

MUTO DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

## EXHIBIT A

I, Cristina Salgado, declare:

1.      I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2015.5 and California Civil Code section 1780(d).

3.      I purchased a 24-pack of Niagara water bottles in Los Angeles County, California. My most recent date of purchase was approximately on or around April 10, 2021.

4.      I purchased an 8-pack of Dasani water bottles in Los Angeles County, California. My most recent date of purchase was approximately on or around April 20, 2021.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 28th day of April 2021, in Los Angeles, California.



Cristina Salgado

SALGADO DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION

DocuSign Envelope ID: 98E59680-D8F5-1A79-A623-B19D5F29258D

### EXHIBIT A

I, David Swartz, declare:

1.      I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Code of Civil Procedure section 2015.5 and California Civil Code section 1780(d).

3.      I purchased a 20-once bottle of Arrowhead water in Merced County, California. My most recent date of purchase was approximately on or around November 15, 2020.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 13th day of May 2021, in Oakland, California.



DocuSigned by:

F84B95A8CD184CB...

David Swartz

SWARTZ DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION